

# IN THE COURT OF CRIMINAL APPEALS
# OF TEXAS

NO. PD-0907-17

**CHRISTOPHER ERNEST BRAUGHTON, Appellant**

**v.**

**THE STATE OF TEXAS**

**ON APPELLANT'S PETITION FOR DISCRETIONARY REVIEW
FROM THE FIRST COURT OF APPEALS
HARRIS COUNTY**

ALCALA, J., delivered the opinion of the Court in which KEASLER, RICHARDSON, NEWELL, and KEEL, JJ., joined. KELLER, P.J., filed a dissenting opinion in which WALKER, J., joined. YEARY, J., concurred. HERVEY, J., did not participate.

## O P I N I O N

In this petition for discretionary review filed by Christopher Ernest Braughton, Jr., appellant, we affirm the court of appeals's conclusions that the evidence was legally sufficient to uphold his murder conviction and that there was no harmful error in the jury charge due to the omission of a lesser-included offense instruction on felony deadly conduct. At trial, appellant acknowledged shooting the complainant, Emmanuel Dominguez, but he claimed that he did so because he reasonably believed the use of such force was immediately

necessary to protect himself and his father against Dominguez's attempted use of deadly force. The jury rejected appellant's defensive theory, convicted him of murder, and assessed a sentence of twenty years' imprisonment. We conclude that, viewing the evidence in the light most favorable to the verdict and deferring to the jury's credibility determinations and its resolution of the conflicting testimony, the evidence supports a rational jury's rejection of appellant's self-defense and defense of third person claims, and thus the evidence is legally sufficient to uphold his conviction for murder. Furthermore, assuming it was error to deny the instruction on felony deadly conduct, our review of the record demonstrates that appellant was not harmed by any such error in the trial court's charge. We, therefore, affirm the judgment of the court of appeals upholding appellant's conviction and sentence for murder.

## I. Background

We review the factual background before turning to the analysis conducted by the court of appeals.

### A. Factual Background

The events at issue in this case occurred one evening in May 2013 in a residential subdivision in Spring. At that time, appellant, who was twenty-one years old, lived in a house situated on a cul-de-sac with his parents, Melissa and Ernest Braughton Sr., and his younger brother Devin. The complainant, twenty-seven-year-old Emmanuel Dominguez, also lived in that cul-de-sac, having moved there two weeks earlier to live with his girlfriend.

Although they were neighbors, the Braughtons testified that they had never seen Dominguez before the day of his death and were unaware that he lived on their street.

Earlier that day, after spending the afternoon drinking at several bars in the Spring area, Dominguez got into an argument with his girlfriend. At around 9:45 p.m., Dominguez indicated he was ready to leave the bar to go home. His girlfriend refused to go with him, and she stayed behind at the bar. Dominguez departed for home alone on his motorcycle.

On his way home, Dominguez encountered appellant's father, Braughton Sr., who was also driving home after going to dinner with Melissa and Devin. According to testimony from Braughton Sr. and Melissa, Dominguez began tailgating Braughton Sr.'s car while revving his engine and, at one point, he was following so closely that he set off the car's rear proximity sensor. Appellant's parents reported that, as they drove through their neighborhood, Dominguez sped to the side of their car and swerved as if to hit them. Later, Dominguez again swerved toward the family's car and then pulled into the lane in front of them, slamming on his brakes. Braughton Sr. reported that he slammed on his brakes to avoid a collision and then drove around the motorcycle "fast." Dominguez continued tailgating and following the family's car "right on [the] bumper." Braughton Sr. was speeding and trying to get away from the motorcycle, believing that Dominguez was "fixing to carjack us, rob us."

As the family's car pulled into the cul-de-sac, Melissa made a phone call to appellant, who had stayed behind at home while the rest of the family was out at dinner. Melissa

recalled stating to appellant, "Son, this guy is chasing us, we're right by the house," whereas Braughton Sr. recalled her saying, "Son, there's a guy chasing us, I'm scared." The call lasted only a few seconds. According to Braughton Sr., Melissa's tone was "very frantic." Melissa testified that she was fearful that the man on the motorcycle would "shoot into the car," and she was "panicking" because she was "not knowing what he's going to do to us."

After the point in time at which the vehicles arrived in the cul-de-sac, the descriptions of the events differ significantly and it is necessary to detail the particular versions as told by different witnesses. We begin with the defense witnesses because they provide a more complete story from beginning to end, before turning to the State's witnesses who discussed portions of the events. The relevant defense witnesses included appellant's parents, appellant, and a neighbor, Glen Irving. The State's witnesses included neighbors Robert Bannon and a teenager, Gina,[1] the medical examiner Dr. Gonsoulin, and the lead scene investigator, Deputy Medina.

**1. Appellant's Parents**

Because the testimony of appellant's parents is mostly consistent, we address their testimony jointly.

As the vehicles entered the cul-de-sac, they circled around and came to a stop in the street. Braughton Sr. reported that Dominguez then "fell" off his bike without engaging the kick stand and immediately ran toward his car. Braughton Sr. got out of the car and yelled

---

[1]    Because Gina was a minor at the time of the events in question, the court of appeals used a pseudonym. For consistency, we will also refer to this witness as Gina.

at his wife and son Devin to get inside the house and call 911. Braughton Sr. stated that, as Dominguez was "hollering" at him, he could smell alcohol and he believed Dominguez was "drunk." Braughton Sr. recalled telling his wife at this point, "Call 911, he's drunk." Braughton Sr. acknowledged that he was also yelling at Dominguez and asking him why he was following so closely.

Braughton Sr. stated that, after approaching him, Dominguez punched him twice in the face. Braughton Sr. pushed Dominguez back. Melissa began running towards the entrance to her house with Devin, trying to get him inside. At this point, appellant came out of the house with his hand in the air holding a gun, saying, "Stop, I have a gun. Stop I have a gun."[2] Dominguez punched Braughton Sr. again, and Braughton Sr. fell to the ground. At this point, Braughton Sr. and Melissa reported that they heard Dominguez say, "You got a gun motherf**ker, I have something for your f**king ass," or, alternatively, "Oh, you got a gun, motherf**ker, I got a gun for your ass."[3] Braughton Sr. and Melissa then reported that they observed Dominguez turn and open a box or saddlebag on his motorcycle, reach into it,

---

[2]     According to Melissa, appellant had purchased the gun, a nine millimeter handgun, around three months prior to the shooting. The gun was purchased because appellant wanted to "go into law enforcement" as a career, "and for security reasons also." Although the gun belonged to appellant, the gun was kept in Melissa and Braughton Sr.'s bedroom. Melissa explained that she had agreed to let appellant keep a gun in the house only on the condition that the gun would be stored in her bedroom.

[3]     Both Braughton Sr. and Melissa described this statement by Dominguez multiple times during their testimony. At various points, the statement was described in a slightly different manner.

and then they heard the "pop" of the gun.[4]  Immediately prior to the shot, Braughton Sr. saw appellant pointing his gun and standing approximately three feet away from Dominguez. Braughton Sr. asserted that he did not say anything to appellant, nor did he hear his wife tell appellant to go back inside.  He did not observe Dominguez raise up his hands or begin backing away from appellant. After Dominguez was shot, Braughton Sr. observed him stumble backwards towards the curb, where he fell. Melissa ran outside holding the phone and stating that she had the 911 operator on the line, and she handed Braughton Sr. the phone.

On cross-examination, the State sought to impeach appellant's parents' version of the events by pointing out inconsistencies between their trial testimony and prior out-of-court statements.  Among other matters, the State noted that Braughton Sr. had previously indicated that Dominguez "lunged" at appellant immediately prior to being shot, and the State suggested that that testimony was inconsistent with Braughton Sr.'s trial testimony that Dominguez had been shot while reaching over to retrieve something from his saddlebag. The State also pointed out that, on the 911 call immediately following the incident, Braughton Sr. had not told anyone that the Braughtons were afraid Dominguez was going to rob or carjack them or concerned that he was about to retrieve a gun; instead, Braughton Sr. told the 911 operator that Dominguez was following him and had attacked him, and that his son shot

---

[4]  Melissa testified that she heard but did not see the shot because she was heading towards the house and away from the fight at that point. She also testified that she never saw appellant point his gun at Dominguez.

Dominguez. The State further highlighted that Braughton Sr. had not at any point told police officers following the shooting that Dominguez appeared to be reaching for a gun. In his prior statement, Braughton Sr. had indicated that he "may" have punched Dominguez once or twice, but during his trial testimony he denied doing this and said he only pushed Dominguez back.

The State similarly sought to impeach Melissa's testimony by showing that, in an out-of-court statement made around one month after the shooting, she had indicated that she may have told appellant to take his gun inside when she first saw him coming out of the house, but in her trial testimony she denied having made that statement. The State also highlighted the fact that, although Melissa indicated she did not see the shooting and never saw appellant point a gun at Dominguez, she did contend that she saw Dominguez reach into his saddlebag immediately prior to the shooting while she was running towards the house and away from the scene of the shooting. The State further pointed out that, when Melissa had given a statement to an investigating officer on the night of the shooting, she had not mentioned that Dominguez verbally threatened that he had a gun or that he appeared to be reaching for something.

**2. Appellant**

Appellant testified that, on the night of the shooting, he was sitting in the kitchen when he got a call from his mother. He said she was "kind of screaming" and "sounded terrified." Appellant had never heard his mother like that before and could tell something

was wrong. Melissa told appellant there was "some guy chasing" them. At that point, appellant ran to the front door and opened it. He heard a loud motorcycle noise and ran back inside to grab his gun from the night stand in his parents' bedroom. Appellant loaded the gun and removed the safety so that it was ready to fire.

As appellant reached the front door and started to go outside, he observed Dominguez attacking and punching Braughton Sr. in the face. Appellant began "running out of the house with the gun in the air saying, 'Stop, I have a gun.'" Appellant explained that he said this phrase two or three times and was "trying to diffuse the situation." Appellant saw his mother and brother running toward the house and his father being attacked, and appellant "thought we were getting robbed, killed. I didn't know exactly." As appellant got closer, Dominguez knocked Braughton Sr. onto the ground. Dominguez was standing "behind the taillight" of his motorcycle, right next to the bike. According to appellant, Dominguez turned towards him and said, "Oh, you have a gun, motherf**ker, I have a gun for you." At this point, appellant had lowered his weapon and pointed it at Dominguez. Dominguez "reach[ed] over with his right arm to his satchel" on his motorcycle, which was to the left of him. As Dominguez was "coming up," appellant shot him once, shooting "towards his arm." Appellant reported that he was standing around six or seven feet away from Dominguez. Appellant stated that immediately after the shooting, he "just stood there for a while" because he "didn't know what happened." Asked to describe his state of mind immediately prior to the shooting, appellant stated that his "goal was to stop this man from attacking my family,"

and "all [he] wanted was for him [Dominguez] to stop."

### 3. Glen Irving

In addition to presenting the testimony of appellant and his parents, the defense called a neighbor, Glen Irving, to testify. Irving did not live in the cul-de-sac but lived in a house located near the corner where the street leading into the cul-de-sac began. Irving indicated that he was familiar with the Braughton family. He testified that, on the night in question, he heard a noise and went outside. He saw the motorcycle tailgating the sedan into the cul-de-sac "very, very close." Once the vehicles had stopped in the cul-de-sac, he saw the rider of the motorcycle, Dominguez, "abruptly get[ ] off the motorcycle" and "quickly head[ ] to the car that had stopped." After the driver of the car, Braughton Sr., got out, Dominguez began "punching and beating up" Braughton Sr.

Irving then heard a voice, "kind of loudly, maybe kind of shouting, saying 'Stop, I've got a gun.'" The person said this twice and "repeated it." Irving did not see the person who said he had a gun. Shortly after that, Irving reported that Braughton Sr. was "knocked to the ground." Dominguez "turned and started back towards the motorcycle," and he heard a voice say, "Yeah, I got a gun too, motherf**ker,'" or, "I've got something for you, motherf**ker."[5] Irving acknowledged that he had some uncertainty of what was said because he was not standing very close. After that, Irving heard a gunshot, and Dominguez "kind of just went past the motorcycle and stumbled and fell right between" the sidewalk and the street on a

---

[5] Like the testimony from appellant's parents, Irving described Dominguez's statement two different ways at different points in his testimony.

grassy area.

Irving described that, at the time of the shot, Dominguez was positioned between the car and the motorcycle and was moving "towards the motorcycle." Irving acknowledged that he did not actually see the shooter or a gun that day. Irving similarly stated he did not see Dominguez reach for anything inside the motorcycle. Irving could not recall what Dominguez was doing with his hands at the time that he was shot. After the shooting, Irving observed several other neighbors run over, and he observed Melissa attempting to perform CPR on Dominguez. Later, Irving saw Braughton Sr. and observed that his face was "beat up."

**4. Robert Bannon**

The State presented the testimony of another neighbor, Robert Bannon. Although Bannon did not witness the shooting, he did see the events immediately preceding and following the shooting.

Bannon had been sitting outside his home in the driveway at the time that appellant's family and Dominguez pulled into the cul-de-sac. Bannon's home was situated between the Braughton home and Dominguez's home. Bannon confirmed the other witnesses' testimony regarding the fact that Dominguez was tailgating the Braughtons' car "really close" into the cul-de-sac. Before the vehicles arrived in the cul-de-sac, Bannon heard tires screeching. Bannon stated that both vehicles "went [in] a loop in the cul-de-sac and then stopped." Braughton Sr. then quickly got out of his car and "starts yelling at the guy on the

motorcycle," stating, "Why the f**k you following me so close for?" Bannon observed the man on the motorcycle, Dominguez, quickly get off his bike, almost dropping it, and begin yelling back. The two men were "standing in the street facing each other and yelling back and forth." Bannon testified that, at this point, he was around twenty feet away from where the men were standing. During the time that Bannon was observing the events, he did not witness anyone throw a punch or kick at each other, the two were "just yelling."[6]

Bannon then saw appellant come out of the front door of the house with a gun in his hand. Bannon stated that the gun was "raised up in the air," and Bannon heard appellant yell, "I have a gun." Bannon stated that Braughton Sr. told appellant to "go back inside." At that point, Bannon went into his house to retrieve his rifle. Bannon explained that he was going to get his gun to try to "diffuse the situation, have [appellant] put his gun down." Bannon was inside his house for around a minute. By the time Bannon went back outside, Dominguez had been shot and was lying on the ground. At that point, Bannon set his gun down inside his house, and he went over to help administer CPR.

**5. Gina**

A different version of events was told by a third neighbor, Gina. Gina was a junior in high school at the time of the shooting. Her family lived across the cul-de-sac from the

---

[6]     We note that the evidence is essentially uncontested that Dominguez did at some point punch Braughton Sr. in the face, given a photographic exhibit in the record showing Braughton Sr.'s injury, and given expert testimony indicating the presence of Braughton Sr.'s DNA on Dominguez's fist. Because Bannon acknowledged that he eventually went inside his house to retrieve his gun, the most likely explanation for his testimony in this regard is that he left to go inside before Dominguez punched Braughton Sr., and thus did not personally observe the punch or punches.

Braughtons and Dominguez. Gina testified that she observed the shooting from her second-story bedroom window. At around 10 p.m. on the night of the shooting, Gina was about to go to bed. She first heard the "noise of the motorcycle," followed by "yelling and arguing" coming from outside. Asked whether she knew what the fight was about, she stated that she "couldn't understand everything," but she thought the argument was about the motorcycle. Gina peeked through the blinds of her window to see what was happening. She saw a car parked in the middle of the cul-de-sac and a motorcycle on the ground. She saw four people outside. She first saw two men arguing and a woman standing there, and later another man. Gina identified the four people by their gender and the color of their clothing (orange shirt, red shirt, and black shirt) rather than by their names, but for simplicity we refer to them by their names. Gina recognized all of the people as her neighbors, though she did not personally know them.[7] Gina observed Braughton Sr. and Dominguez arguing, but she "didn't see any fighting from when I looked out the window." She testified that she "couldn't make out what they were saying. I just heard yelling."

Gina then saw appellant coming from his house toward where the men were standing and arguing. Gina indicated that appellant came walking towards Dominguez with "his right arm stretched out with a gun in his hand." Appellant was "just walking straight to the guy in the red shirt [Dominguez] and then he stop[ped]." As soon as Dominguez saw the gun, "he just stopped and put his hands up." At this point in the record, on direct examination,

---

[7] Gina later acknowledged that the man in the red shirt was Dominguez; the man in the orange shirt was Braughton Sr.; and the man in the black shirt was appellant.

the prosecutor asked Gina to "show the jury what the man in the red shirt did, just visually." The record indicates that Gina complied with this request, but there is no description in the record of her physical demonstration.

According to Gina, the woman then said to appellant, "Put the gun down." Appellant responded, "No, I got a gun now." Appellant and Dominguez were standing around five feet apart at that point. Appellant was standing "behind the motorcycle by the curb," while Dominguez was over by the grass. According to Gina, Dominguez started "slowly back[ing] up" while appellant "just stood there." Gina did not see Dominguez go toward the motorcycle, open a saddlebag, or reach for anything in the motorcycle. At this point, appellant fired the gun, and Dominguez fell back. After that, Gina recalled that the woman said to appellant, "What did you do?" Gina testified that she stopped looking out the window at that point because she was scared and "in shock."

On cross-examination, defense counsel elicited testimony indicating that the exterior of Gina's window was covered by a black solar screen. Gina admitted that, when looking out the window through the solar screen, it changes or distorts what she can see "a little" and can make things like faces look "blurry." She also said she had not seen the faces of the individuals involved in the incident and did not actually see the gun because things were "blurry" as a result of the screen. Gina, however, also stated that she had her face "pretty close" to the window, which afforded her a better view on the night in question. Defense counsel also elicited testimony from Gina acknowledging that there were no street lights on

the side of the street where the motorcycle was; the streetlights were on her side of the street.

On re-direct examination, however, Gina reasserted that she had clearly seen the events and that "only the weapon" was blurry due to the effect of the solar screen.[8]

The defense also sought to impeach Gina's testimony by highlighting inconsistencies between her recorded statement given to investigators several hours after the shooting and her trial testimony. In her prior statement, Gina had indicated that it was appellant who was initially fighting with and shoving Dominguez, but when asked about this inconsistency at trial, Gina said she "meant to say" it was Braughton Sr. who was fighting with Dominguez. Gina's recorded statement was played for the jury.[9] When asked to explain her prior

---

[8] The defense also later called the person who had installed the solar screen on Gina's window, Gary Gross, as a witness to establish the effect of a solar screen on a person's visibility through a window at nighttime. Gross testified that a solar screen like the one Gina had installed on her window blocks 90 percent of visible light. Gross testified that it would make a "huge difference" whether someone was looking through a solar screen during the day versus at night because if the light decreases, "your visibility is going to decrease as well." Gross testified that ambient light at night or the light from streetlights would be inadequate to permit a person to clearly see through a solar screen. On cross-examination, however, Gross agreed that a person can see better out of a solar screen the closer the person gets to the screen, and if the person is looking straight through the screen rather than at an angle.

[9] Gina's recorded statement indicated as follows:

> I saw the man wearing all black talking to the man with the red shirt. And they started yelling at each other and fighting. And then they started shoving each other. The one wearing all black, he starts pulling out a gun. A woman starts saying put the gun down. He says no. And so then he started shooting, only one time. And then the man in the red shirt he falls down. . . .

Upon further questioning by the investigator, Gina indicated that she "didn't see the gun exactly, because my window's kinda blurry. But I knew he [the man in black] had a gun." The investigator asked Gina what the man in the red shirt was doing once the man in the black shirt brought out his gun. Gina indicated he backed up and put his hands back, and "he was just like, 'whoa.' And then

inconsistent statement, Gina maintained that she had not actually seen anyone physically fighting with Dominguez on the night in question—neither appellant nor Braughton Sr.

### 6. Medical Examiner Dr. Gonsoulin

Dr. Gonsoulin, an assistant medical examiner at the Harris County Institute of Forensic Sciences, was called by the State to testify regarding the autopsy that was performed on Dominguez. Dr. Gonsoulin reported that Dominguez had a bullet lodged on his left side near his armpit, with a gunshot entry wound near the right armpit towards the back. Aside from the gunshot wound, Dominguez did not have any other bruises or visible injuries. Dr. Gonsoulin reported that the path of the bullet traveled from right to left, slightly upward, and slightly from back to front towards the chest, "basically from the right armpit over to the left armpit." As it traveled, the bullet passed through multiple internal organs, resulting in Dominguez's death within seconds. Dr. Gonsoulin indicated that Dominguez was intoxicated at the time of his death, with a blood alcohol content of 0.17 grams per deciliter.

Dr. Gonsoulin's opinion regarding the likely positioning of Dominguez at the time of the shooting was the subject of extensive questioning by both the State and the defense. On direct examination, Dr. Gonsoulin testified that the location of the gunshot entry wound signaled that, at the time he was shot, Dominguez's "armpit was exposed, which means that his shoulders were at least raised to expose that area of the body." She agreed with the

_____

I remember [appellant] saying, I have a gun, I have a gun. And the woman was saying put it away." Asked to demonstrate how Dominguez had his hands when he was shot, Gina agreed with the investigator's suggestion that he had "his palms facing like 'stop' towards the guy in black." After Dominguez fell, Gina indicated that the woman was yelling, "What did you do?"

prosecutor's suggestion that this would include someone having his arm and shoulders raised, or any other position that would expose that part of the body. She further agreed with the suggestion that, based on where the bullet entered the body, the gun could not have been pointing straight ahead at Dominguez's chest, but if he had turned in front of the gun, then the bullet could have struck him on the right side of his body. Regarding the path of the bullet being slightly upward, Dr. Gonsoulin responded that that "just means that at the time the bullet traveled through the body, that the left [side] was slightly downward but very slightly." The prosecutor then asked whether the bullet's trajectory would be "consistent with a gun aimed towards the floor and striking" Dominguez. Dr. Gonsoulin responded, "Anything that winds up and creates an almost straight across path with just a little bit downward would work. So I wouldn't imagine that it's sharply downward. It would be just down by a hair." Later in her testimony on re-direct examination, Dr. Gonsoulin clarified that, even if Dominguez had been reaching for something, he would still have had to raise his shoulder or arm enough to expose the back of the armpit. In any event, Dr. Gonsoulin acknowledged that she could not definitively state what position Dominguez was in at the time of the shooting, only that the back of his armpit was exposed.[10] In sum, Dr. Gonsoulin

---

[10] The following exchange occurred:

Q. [State] And when you put your arm across your body, you raise your right shoulder, correct?
A. [Dr. Gonsoulin] That's correct.
Q. And it's—do you need to raise your shoulder in order to expose where the gunshot wound went into Emmanuel Dominguez?
A. Yes.
Q. And so even if I was reaching—if I was reaching down, would that expose that area?

agreed with the prosecutor's suggestion that there was nothing inconsistent with Dominguez's injuries about him backing up and turning at the time that he was shot.

On cross-examination, Dr. Gonsoulin also agreed with defense counsel's statement that it was "impossible" that Dominguez was shot while directly facing the shooter with his arms up because that would be "inconsistent with the gunshot wound" to the armpit. She further agreed with defense counsel's suggestion that Dominguez's wound would be consistent with someone reaching across his body, or reaching while being in a slightly bent position, "which exposes the back of the armpit." But she indicated that Dominguez would not have been bending too far down because that position would lower the shoulder and arm and "cover[] up that armpit."

### 7. Law Enforcement Evidence

In addition to the testimony described above, the State presented testimony from several law enforcement officers describing the scene on the night of the shooting. Because much of this testimony is redundant, we review only the testimony of the lead scene investigator, Deputy Medina, below.

Deputy Medina testified that, when she arrived at the scene, she first observed a

---

A. It would depend on the rotation. There might be an angle where you could just be reaching down and that would be exposed, but you would have to at least extend your shoulders slightly to get the differential in the arms.
Q. And you're not saying you know what position Emmanuel Dominguez was and the shooter was at the time of the shooting, correct?
A. That's correct.
Q. All a gunshot wound tells you is that that area of the body was exposed wherever he was shot?
A. That's correct.

motorcycle on its side with the lights on. Next to the motorcycle was Dominguez's body, lying in the grassy area that separates the sidewalk and the curb. Medina indicated that appellant had identified himself as the shooter. Appellant told Medina that he "saw a man hitting my dad in the face and I shot him."

Describing the physical evidence found at the scene, Deputy Medina stated she observed a single spent shell casing lying in the street. Medina took several measurements. Measuring the distance between Dominguez's stomach and the motorcycle, Dominguez was lying around fifteen feet away from the front wheel of the motorcycle. The shell casing was found around eleven feet away from the body, between the front wheel of the motorcycle and Dominguez's body. The saddlebag was around two to three feet high off the ground. Medina observed that the left saddlebag was open.

Medina also measured the distance from Gina's window to the area of the shooting. Medina testified that the distance from Gina's window to where the motorcycle was situated was around eighty to eighty-five feet, and the distance to Dominguez's body was ninety feet.

Medina testified that officers searched the motorcycle but did not find any weapons; only some clothing and keys were found in the saddlebags. Officers also searched Dominguez's body and did not find any weapons. Medina testified that she observed Braughton Sr. on the night of the shooting and could confirm that he had an injury to his mouth and lip consistent with being punched.

**B. The Court of Appeals's Analysis**

On direct appeal, appellant contended that the evidence was insufficient to support the jury's rejection of his claim that his conduct in shooting Dominguez was justified by the law of self-defense and/or defense of a third person. He also contended that the trial court had erred by rejecting his request for an instruction on the lesser-included offense of deadly conduct. The court of appeals upheld his conviction. *Braughton v. State*, 522 S.W.3d 714, 719, 742 (Tex. App.—Houston [1st Dist.] 2017) (substitute op.).[11]

With respect to appellant's complaint regarding the sufficiency of the evidence, the court reasoned that, even if the jury believed some of the defensive testimony, it rationally could have concluded that appellant's use of deadly force was not immediately necessary to protect himself or his family from Dominguez's impending attempted use of deadly force. *Id.* at 731-32. The court of appeals observed that appellant's father was on the ground at the time of the shooting; there was no evidence that Dominguez had a weapon during the fight with appellant's father; and Dominguez was not using his hands as deadly weapons or kicking or jumping on appellant's father. *Id.* at 732. The court of appeals reasoned that, "at the moment of the shooting, Dominguez had ceased using any force at all, and the punches he had landed on Braughton Sr. up to that point do not amount to deadly force that could create a reasonable belief that deadly force was necessary . . . . In sum, [appellant] adduced no evidence that Dominguez used his hands in a deadly manner or used or threatened to use

---

[11]    Appellant also argued that the evidence was insufficient to show that he acted with the requisite culpable mental state to support his conviction for murder. This contention is not encompassed within the grounds upon which we granted review, and thus we do not consider it.

deadly force of any kind before [appellant] brought a gun to the encounter." *Id.*

Regarding the evidence suggesting that Dominguez was reaching for a gun, the court of appeals similarly concluded that that evidence could rationally have been rejected by the jury. *Id.* The court noted the inconsistencies in the witness testimony, observing that the defense witnesses testified that Dominguez either said he had a "gun" or "something" for appellant. *Id.* No witness ever saw a gun in Dominguez's possession, and law enforcement did not recover any weapon other than appellant's gun. *Id.* Given these circumstances, the court concluded that the jury was "free to reject the testimony that Dominguez threatened [appellant] with and attempted to retrieve a gun[.]" *Id.* at 732-33.

The court of appeals also addressed appellant's arguments assailing the testimony of Gina. *Id.* at 733. Appellant had contended, among other arguments, that Gina's testimony could not have been rationally accepted by the jury because her testimony that Dominguez was backing away with his arms up was contradicted by the medical examiner's testimony. The court of appeals disagreed. It noted that, although Dr. Gonsoulin acknowledged that the medical evidence was consistent with the defense's theory of Dominguez reaching into the saddlebag, she also gave testimony that was "in some ways supportive of Gina's account." *Id.* The court of appeals took note of Dr. Gonsoulin's testimony that, while a person's armpit would be exposed if he was reaching far enough, it would not be exposed if someone was reaching across and too far down because reaching down "cover[s] up that armpit." *Id.* The inference from this testimony, combined with the other evidence showing that Dominguez's

motorcycle was laid on the ground, was that Dominguez "likely was not reaching down when he was shot." *Id.* Moreover, even to the extent that Gina's testimony may have been mistaken regarding the direction Dominguez was facing when he was shot, the court of appeals noted that "a jury may disregard mistakes by a witness on one portion of the witness's testimony and still credit other portions of the witness's testimony—here that Dominguez had his hands up." *Id.* at 733-34. Further, the court of appeals noted that Dr. Gonsoulin testified Dominguez could have turned shortly before being shot. *Id.* at 734.

Regarding the other weaknesses or inconsistencies in Gina's testimony, the court of appeals continued, "Nor can we conclude that the imperfections in Gina's testimony by themselves are sufficient to conclusively establish a reasonable doubt. Even without Gina's testimony, the jury was not required to accept [appellant's] defensive claims." *Id.* Viewing the evidence in the light most favorable to the verdict, the court of appeals held that the jury could have rationally chosen to disbelieve the defensive evidence that would have supported appellant's claims of self defense or defense of a third person. *Id.* at 734-35.

In addition to rejecting his complaint regarding the sufficiency of the evidence, the court of appeals also held that the trial court had not committed reversible error by denying appellant's request for a lesser-included offense instruction on felony deadly conduct. *Id.* at 735-42. The court of appeals held that it need not determine whether the denial of the instruction was erroneous under these circumstances because, in any event, the error was harmless. *Id.* at 740. The court of appeals noted that the jury had received an instruction on

the intervening lesser-included offense of manslaughter and had rejected it. *Id.* The court reasoned that, if the jury had believed appellant lacked the requisite intent for murder, "it would have convicted him only of manslaughter; its rejection of manslaughter (and [appellant's] defenses) indicates that it legitimately believed he committed murder." *Id.* at 741. Because manslaughter was "just as plausible a theory as deadly conduct," and because the jury rejected manslaughter under the evidence presented, the court held that appellant was not harmed by any error in the charge. *Id.* at 742.[12]

This Court granted appellant's petition for discretionary review to evaluate both the court of appeals's sufficiency analysis and its analysis of his jury-charge complaint.[13]

## II. Sufficiency of the Evidence to Support Jury's Rejection of Defensive Issues

---

[12] On original submission, Justice Keyes dissented on the basis of her disagreement with the majority opinion's analysis of the sufficiency of the evidence to support the jury's rejection of the defensive issues. The majority subsequently withdrew its original opinion and issued a substitute opinion that altered only its analysis of appellant's complaint of jury-charge error. Justice Keyes remained in the dissent upon the opinion being re-issued, but it is unclear whether she retained her original dissenting opinion in this case, as the official reported version of the case does not appear to include her dissenting opinion.

[13] The three grounds in appellant's petition for discretionary review state,

1. What is the standard of review for evaluating a claim of legally insufficient evidence on the State's non-evidentiary burden of persuasion in a claim of self-defense [or] defense of others? Specifically, how should an intermediate-appellate court weigh the evidence to determine whether the State met its non-evidentiary burden of persuasion?

2. Whether the intermediate appellate court erred when it determined that the State met its non-evidentiary burden of persuasion and that appellant was unjustified in acting in self-defense [or] defense of others?

3. Whether the trial court's erroneous decision not to issue a requested lesser included offense was harmless as the intermediate appellate court concluded in its re-issued opinion?

In his first and second grounds in his petition for discretionary review, appellant contends that the court of appeals erred in its sufficiency analysis both in its understanding of the applicable law and in applying that law to the facts of his case. Specifically, appellant contends that the court of appeals's understanding of the legal standard for evaluating the sufficiency of the evidence in this context was flawed because that standard permitted the court to engage in a speculative and irrational review of the evidence. Appellant contends that, in light of the significant weaknesses in the State's case and the strength of the defensive evidence, the court of appeals erred in concluding that a rational juror could have determined, beyond a reasonable doubt, that appellant's conduct was not justified by self defense or defense of a third person.

We begin our analysis of these issues by setting forth the proper applicable law for evaluating a claim of legally insufficient evidence to support the jury's rejection of claims of self defense and defense of third persons in the context of the use of deadly force against another. We then explain why we disagree with appellant's complaints regarding the court of appeals's understanding of the applicable law and its ultimate rejection of his sufficiency challenge.

**A. Applicable Law**

We will review (1) the substantive law of self-defense and defense of third persons, (2) general principles governing legal sufficiency review, and (3) the particular manner in which a reviewing court should evaluate the sufficiency of the evidence to support the jury's

rejection of these defensive claims.

**1. Law of Self-Defense and Defense of Third Persons To Justify Use of Deadly Force**

The Texas Penal Code provides that deadly force used in self-defense or in defense of another is a defense to prosecution for murder if that use of force is "justified." *See* TEX. PENAL CODE §§ 9.02 ("It is a defense to prosecution that the conduct in question is justified under this chapter."); 9.31–9.33 (setting forth substantive requirements for establishing claim of self-defense or defense of third person).

Penal Code Section 9.31 provides that, subject to certain exceptions, a person is justified in using force against another "when and to the degree the actor reasonably believes the force is immediately necessary to protect the actor against the other's use or attempted use of unlawful force." *Id.* § 9.31(a). The use of force is not justified in response to verbal provocation alone, or if the actor provoked the other's use or attempted use of unlawful force. *Id.* § 9.31(b). A "reasonable belief" in this context is defined as "one that would be held by an ordinary and prudent man in the same circumstances as the actor." *Id.* § 1.07(a)(42).

A person is justified in using deadly force against another (1) if he would be justified in using force against the other under section 9.31, and (2) "when and to the degree the actor reasonably believes the deadly force is immediately necessary: (A) to protect the actor against the other's use or attempted use of unlawful deadly force, or (B) to prevent the other's imminent commission of aggravated kidnapping, murder, sexual assault, aggravated sexual

assault, robbery, or aggravated robbery." *Id*. § 9.32(a).[14] The actor's belief that the deadly force was immediately necessary is presumed to be reasonable under certain circumstances, including that the actor "knew or had reason to believe that the person against whom the deadly force was used" was committing or attempting to commit one of several enumerated serious felony offenses, and that the actor did not provoke the person against whom the force was used and was not otherwise engaged in criminal activity, other than a Class C misdemeanor traffic violation.[15]

With respect to defense of a third person, a person is justified in using deadly force against another to protect a third person if: (1) under the circumstances as the actor reasonably believes them to be, the actor would be justified under Section 9.32 in using deadly force to protect himself against the unlawful deadly force he reasonably believes to

---

[14]     Deadly force "means force that is intended or known by the actor to cause, or in the manner of its use or intended use is capable of causing, death or serious bodily injury." *Id.* § 9.01(3).

[15]     In full, Penal Code Section 9.32(b) states:

The actor's belief under Subsection (a)(2) that the deadly force was immediately necessary as described by that subdivision is presumed to be reasonable if the actor:
(1) knew or had reason to believe that the person against whom the deadly force was used:
    (A) unlawfully and with force entered, or was attempting to enter unlawfully and with force, the actor's occupied habitation, vehicle, or place of business or employment;
    (B) unlawfully and with force removed, or was attempting to remove unlawfully and with force, the actor from the actor's habitation, vehicle, or place of business or employment; or
    (C) was committing or attempting to commit [aggravated kidnapping, murder, sexual assault, aggravated sexual assault, robbery, or aggravated robbery];
(2) did not provoke the person against whom the force was used; and
(3) was not otherwise engaged in criminal activity, other than a Class C misdemeanor that is a violation of a law or ordinance regulating traffic at the time the force was used.

TEX. PENAL CODE § 9.32(b).

be threatening the third person he seeks to protect; and (2) the actor reasonably believes that his intervention is immediately necessary to protect the third person. *Id*. § 9.33; *Henley v. State*, 493 S.W.3d 77, 89 (Tex. Crim. App. 2016) ("[A] defendant is justified in defending a third person if, under the circumstances as the defendant reasonably believes them to be, the third person would be justified in defending himself.").

Appellant does not raise a complaint that the jury instructions on self-defense were erroneous in any respect, and the instructions reflect that the jury was correctly instructed on the law of self-defense and the presumption of reasonableness in accordance with the foregoing statutory law. We turn to consider the sufficiency principles that govern our analysis of whether the jury was irrational in rejecting appellant's defensive claims under these circumstances.

### 2. General Principles Governing Legal Sufficiency Review

The due process guarantee of the Fourteenth Amendment requires that a conviction be supported by legally sufficient evidence. *See Jackson v. Virginia*, 443 U.S. 307, 315–16 (1979); *Brooks v. State*, 323 S.W.3d 893, 917 (Tex. Crim. App. 2010). In assessing the sufficiency of the evidence to support a criminal conviction, "we consider all the evidence in the light most favorable to the verdict and determine whether, based on that evidence and reasonable inferences therefrom, a rational juror could have found the essential elements of the crime beyond a reasonable doubt." *Hooper v. State*, 214 S.W.3d 9, 13 (Tex. Crim. App. 2007) (citing *Jackson*, 443 U.S. at 318-19); *see also Brooks*, 323 S.W.3d at 902. We

measure the evidence by the elements of the offense as defined by the hypothetically correct jury charge. *Malik v. State*, 953 S.W.2d 234, 240 (Tex. Crim. App. 1997).

This familiar standard "recognizes the trier of fact's role as the sole judge of the weight and credibility of the evidence after drawing reasonable inferences from the evidence." *Adames v. State*, 353 S.W.3d 854, 860 (Tex. Crim. App. 2011). "On review, this Court determines whether the necessary inferences made by the trier of fact are reasonable, based upon the cumulative force of all the evidence." *Id*.; *Merritt v. State*, 368 S.W.3d 516, 526 (Tex. Crim. App. 2012). We presume that the factfinder resolved any conflicting inferences in favor of the verdict, and we defer to that resolution. *Brooks*, 323 S.W.3d at 922; *see also Clayton v. State*, 235 S.W.3d 772, 778 (Tex. Crim. App. 2007). As a reviewing court, we may not reevaluate the weight and credibility of the evidence in the record and thereby substitute our own judgment for that of the factfinder. *Williams v. State*, 235 S.W.3d 742, 750 (Tex. Crim. App. 2007); *see Brooks*, 323 S.W.3d at 899 (a reviewing court must not sit as "thirteenth juror"; disagree with the jury's "weighing of the evidence"; or "disagree with a jury's resolution of conflicting evidence"). A reviewing court is thus "required to defer to the jury's credibility and weight determinations." *Brooks*, 323 S.W.3d at 899; *see also Montgomery v. State*, 369 S.W.3d 188, 192 (Tex. Crim. App. 2012) (reviewing court must not usurp the jury's role by "substituting its own judgment for that of the jury"). "Although the parties may disagree about the logical inferences that flow from undisputed facts, '[w]here there are two permissible views of the evidence, the fact finder's choice

between them cannot be clearly erroneous.'" *Evans v. State,* 202 S.W.3d 158, 163 (Tex. Crim. App. 2006) (quoting *Anderson v. City of Bessemer*, 470 U.S. 564, 574 (1985)). However, juries are not permitted to come to conclusions based on "mere speculation or factually unsupported inferences or presumptions." *Hooper*, 214 S.W.3d at 15-16 (explaining that speculation is "theorizing or guessing about the possible meaning of facts and evidence presented").

### 3. Specific Manner of Conducting Sufficiency Review for Self-Defense and Defense of Third Persons

This Court's precedent holds that, in a claim of self-defense or defense of third persons that would justify a defendant's use of force against another, the defendant bears the burden to produce evidence supporting the defense, while the State bears the burden of persuasion to disprove the raised issues. *Zuliani v. State*, 97 S.W.3d 589, 594 (Tex. Crim. App. 2003); *Saxton v. State*, 804 S.W.2d 910, 913-14 (Tex. Crim. App. 1991). The defendant's burden of production requires him to adduce some evidence that would support a rational finding in his favor on the defensive issue. *Krajcovic v. State*, 393 S.W.3d 282, 286 (Tex. Crim. App. 2013). By contrast, the State's burden of persuasion "is not one that requires the production of evidence; rather it requires only that the State prove its case beyond a reasonable doubt." *Zuliani*, 97 S.W.3d at 594 (citing *Saxton*, 804 S.W.2d at 913). Thus, "[i]n resolving the sufficiency of the evidence issue, we look not to whether the State presented evidence which refuted appellant's self-defense testimony, but rather we determine whether after viewing all the evidence in the light most favorable to the prosecution, any

rational trier of fact would have found the essential elements of [the offense] beyond a reasonable doubt and also would have found against appellant on the self-defense issue beyond a reasonable doubt." *Saxton*, 804 S.W.2d at 914.

In *Saxton*, we explained that the issue of self-defense is an issue of fact to be determined by the jury, and that "[a] jury verdict of guilty is an implicit finding rejecting the defendant's self-defense theory." *Id.* at 914. In view of the general sufficiency principles described above, we stated, "Defensive evidence which is merely consistent with the physical evidence at the scene of the alleged offense will not render the State's evidence insufficient since the credibility determination of such evidence is solely within the jury's province and the jury is free to accept or reject the defensive evidence." *Id.* We reaffirm these principles from *Saxton*, in conjunction with the general sufficiency principles described above, as providing the proper framework for evaluating a claim of insufficient evidence in this context. *See id.*

**B. Analysis of Appellant's Arguments Regarding Standard of Review**

In his arguments addressing his first ground on discretionary review, appellant acknowledges that the foregoing legal principles "provide the proper standard of review in determining whether the State met its non-evidentiary burden of persuasion." Given that the court of appeals properly cited to these cases as providing the standard of review, appellant's complaint regarding the court of appeals's understanding of the applicable law is not entirely clear. *See Braughton*, 522 S.W.3d at 726, 730-31. We note that the majority of appellant's

arguments in this section of his brief focus on criticizing the particular manner in which the court of appeals applied the standard of review to the facts of his case, rather than identifying deficiencies in the court of appeals's legal standard. These arguments are better addressed in the following section of our opinion where we will review the court of appeals's application of the law to the facts.

Appellant acknowledges that a reviewing court must consider the totality of the evidence in the record in the light most favorable to the verdict and must examine that evidence through the lens of a rational jury. Thus, he appears to implicitly concede that, at least in the abstract, the court of appeals's understanding of the applicable law was correct.

We conclude that the court of appeals properly described and understood the principles governing sufficiency review in this context. Appellant has failed to show any error in the appellate court's understanding of the applicable law. His first ground is overruled.[16]

### C.  Evidence Is Legally Sufficient to Support Jury's Rejection of Defensive Issues

---

[16]    In his first ground for review, appellant also asks this Court to provide general guidance and clarification regarding the proper manner in which an appellate court should weigh competing evidence when evaluating the sufficiency of the evidence to support the jury's rejection of self-defense. Aside from the well-established principles we have described above, we decline appellant's request to provide more specific guidance in this area, absent a showing of some particular error in the appellate court's analysis. This Court's role is to review decisions of the lower appellate courts. *See* TEX. R. APP. P. 66.1, 66.3; *Stringer v. State*, 241 S.W.3d 52, 59 (Tex. Crim. App. 2007) ("In our discretionary review capacity we review 'decisions' of the courts of appeals."). Because appellant has essentially conceded that the court of appeals properly recited the governing legal principles, we decline to provide any abstract guidance on this matter, and instead will proceed to review the particular manner in which the court of appeals weighed the evidence in this case.

In his second ground for review, appellant contends that the court of appeals erred in its sufficiency analysis by "irrationally discounting evidence and thus weighing the evidence erroneously." Appellant asserts that the court of appeals failed to weigh all of the evidence in the record, instead weighing only the evidence that favored the verdict. Due to this error, he contends, the court of appeals mistakenly concluded that the State carried its non-evidentiary burden of persuasion on his defensive issues.

We disagree with appellant's assertions suggesting that the court of appeals erred in applying the law to the facts of this case. In view of the totality of the facts in the record, it is apparent that appellant's defensive claims hinged almost entirely on the credibility of the witnesses who viewed the events. Given this fact, it would have been improper for the court of appeals to apply its own view of the weight and credibility of the witness testimony, thereby substituting its own view for that of the jury.

The dissenting opinion contends that the answer to the sufficiency question in this case hinges on the applicability of the presumption of reasonableness established by Penal Code Section 9.32(b). *See* TEX. PENAL CODE § 9.32(b). But the jury here could have rationally determined that appellant did not have any "reason to believe" that Dominguez was committing or attempting to commit robbery or murder at the time that appellant shot him. In this case, the jury was presented with two conflicting views of the events that occurred that night, and it had to decide the case based on which view it determined was more credible. In general, in the defense version of the incident, (1) appellant's parents feared they were

being robbed or car jacked while being followed home; (2) Dominguez punched Braughton Sr., and Braughton Sr. pushed Dominguez back during the course of yelling at each other; (3) appellant came outside with a gun because he feared that his parents were being robbed, told everyone he had a gun, and no one told appellant to go back inside the house; (4) Dominguez punched Braughton Sr. again and he fell to the ground; Dominguez made a threat that he had a gun too and he reached towards his motorcycle saddlebag; and then appellant shot Dominguez; and (5) this version was consistent with the medical examiner's testimony opining that Dominguez's armpit where the bullet entered would have been exposed if he was reaching for his saddlebag when he was shot.

In stark contrast, in the State's version of the incident, (1) appellant's parents were involved in a road-rage incident, and given that they did not make any pretrial statements indicating that they believed they were being robbed or car-jacked, they were not credible in asserting that belief at trial; (2) Dominguez punched Braughton Sr. but the primary conflict between them was only verbal yelling; (3) appellant appeared outside with a gun, his parents told him to go back inside the house, and his neighbor went into his home to retrieve his own firearm to diffuse the situation and have appellant put his gun down; (4) appellant walked to Dominguez with his right arm outstretched with a gun in his hand because Dominguez had been hitting appellant's father, Dominguez slowly backed up while raising his hands up but he did not reach for anything, and then appellant shot him, and (5) this version was consistent with the medical examiner's testimony opining that Dominguez's armpit where the bullet

entered would have been exposed if he was backing up while raising his hands up and Dominguez turned to the side so that the bullet entered into his right armpit. As explained more fully below in our particular discussions of specific evidence and witnesses, this case in every respect comes down to the jury's assessment of the credibility of the witnesses and evidence, and therefore, we must defer to the jury's verdict in this case.

We agree with the court of appeals's observation that the evidence in the record shows that, as of the time of the shooting, Dominguez had ceased using physical force against Braughton Sr. All of the defense witnesses testified that, as of the moment of the shooting, Braughton Sr. had been knocked to the ground, and Dominguez had begun stepping away from Braughton Sr. back towards his motorcycle. No witness testified that Dominguez had displayed a weapon or made any threat to use a weapon during the physical altercation with Braughton Sr. Given that the assault on Braughton Sr. had ceased by the time of the shooting, we agree with the court of appeals that a rational jury could have determined that the physical assault itself was not of such a nature that it would give rise to a reasonable belief regarding the necessity of deadly force. *See* TEX. PENAL CODE §§ 9.31-9.33; *Braughton,* 522 S.W.3d at 732.

Appellant's primary contention, both at trial and on appeal, appears to be that he reasonably believed deadly force was immediately necessary because Dominguez threatened him with the use of deadly force and appeared to be attempting to obtain a deadly weapon. Appellant relies on his and his parents' testimony indicating that Dominguez made a verbal

threat to use a gun while reaching into the saddlebags of his motorcycle. But, by its implicit rejection of appellant's defenses in finding him guilty, the jury necessarily signaled its disbelief in this testimony as lacking in credibility, and the legal sufficiency standard does not permit us to substitute our view of the credibility of the witness testimony for the jury's. *See Saxton*, 804 S.W.2d at 913-14 (assessment of credibility of defensive evidence is "solely within the jury's province and the jury is free to accept or reject the defensive evidence"; "[a] jury verdict of guilty is an implicit finding rejecting the defendant's self-defense theory").

We acknowledge, as appellant suggests, that these principles affording deference to the jury's credibility determinations are not without limits. A jury's decision to reject witness testimony must be rational in light of the totality of the record, and any underlying inferences used to reject that testimony must be reasonable based upon the cumulative force of all of the evidence. *See Adames*, 353 S.W.3d at 860. Moreover, a jury is not permitted to disregard undisputed objective facts that can support only one logical inference. *Brooks*, 323 S.W.3d at 907; *see also Evans*, 202 S.W.2d at 163. But here, appellant fails to point us to any aspect of the record that would render the jury's credibility determinations irrational in light of these principles.

There is sufficient evidence in the record to rationally support the jury's rejection of appellant's version of the events. Testimony from Gina, an impartial witness, revealed that she did not see Dominguez go towards the motorcycle, open his saddlebag, or reach for anything in the motorcycle, and thus that evidence provides a rational basis upon which the

jury could have rejected appellant's defensive claims and determined that his use of deadly force was not immediately necessary to prevent Dominguez from using deadly force against appellant or his family members. Although appellant points to numerous weaknesses in Gina's testimony, those weaknesses were not so significant that they rise to the level of establishing that it would have been irrational for the jury to credit any part of her testimony whatsoever. The jury was free to evaluate Gina's testimony and disregard mistakes or inconsistencies while crediting other portions of her testimony. *See Febus v. State*, 542 S.W.3d 568, 572 (Tex. Crim. App. 2018) ("A jury may accept one version of the facts and reject another, and it may reject any part of a witness's testimony.").

To the extent that appellant argues Gina's testimony must be disregarded in its entirety because she gave an account that was wholly contradicted by the other witnesses' testimony and the objective medical evidence, we disagree. Gina's testimony that Dominguez was not reaching for anything is supported by witness Irving, who also said he did not see Dominguez reach for anything. Furthermore, Gina's testimony is not inconsistent with the medical examiner's testimony. Appellant concedes that the objective medical evidence from Dr. Gonsoulin could fairly support either the defense theory of the shooting that Dominguez was shot while reaching for something, or the State's theory that Dominguez was shot with his arms raised while turning in front of the weapon. Nothing about Dr. Gonsoulin's testimony, therefore, renders the jury's view of the evidence or its ultimate conclusion irrational. To the extent that portions of Gina's testimony may have had some inconsistencies with portions

of the medical examiner's testimony or other witnesses' testimony, those inconsistencies do not render her account of the events wholly lacking in credibility. Gina's testimony indicated that Dominguez was shot while backing away with his hands raised; that she may have incorrectly suggested Dominguez was directly facing appellant rather than backing away at an angle, or that she failed to indicate that Dominguez turned immediately before being shot, does not mean that the jury was irrational in believing the portion of her testimony indicating that Dominguez's arms were raised at the time he was shot.

In any event, even assuming that Gina's testimony was so undermined by the other evidence that the jury could not have rationally accepted any portion of it, the jury was nevertheless not required to accept appellant's version of events under these circumstances. A jury is permitted to reject even uncontradicted defensive testimony, so long as its rejection of that evidence was rational in light of the remaining evidence in the record and is not contradicted by indisputable objective facts. *See Saxton,* 804 S.W.2d at 913-14; *Brooks*, 323 S.W.3d at 907; *Evans*, 202 S.W.3d at 162-63. Here, as the court of appeals noted, the testimony describing the verbal threat that was made by Dominguez was inconsistent, with some witnesses wavering as to whether Dominguez said he had a "gun" or "something" for appellant, and other witnesses indicating they heard no verbal threat at all. Similarly, whereas appellant and his parents indicated they saw Dominguez reach for his saddlebag, the only other defense witness to observe the moments immediately preceding the shooting, Irving, indicated he did not see Dominguez reach for anything. Furthermore, the defense

witnesses were impeached with contradictions between their trial testimony and their statements immediately following the events that omitted any references to Dominguez reaching for something in his motorcycle or threatening appellant with a gun. Under these circumstances, we cannot conclude that a jury acts irrationally by declining to believe defensive claims by a defendant and his family members.

In light of the absence of any evidence in the record indicating that the jury was irrational in rejecting the defensive testimony that would have established appellant's claims of self-defense or defense of a third person, we agree with the court of appeals's decision declining to substitute its own view of the witnesses' credibility for that of the jury. *See Braughton*, 522 S.W.3d at 734-35 ("We cannot substitute our own view of these witnesses' credibility based on a cold record for that of the factfinder."); *Saxton*, 804 S.W.2d at 913. We hold that the court of appeals properly concluded that the evidence is sufficient to support the jury's rejection of appellant's defensive claims, and we overrule his second ground for review.

### III. Charge-Error Complaint

In his third ground for review, appellant challenges the court of appeals's rejection of his complaint pertaining to the trial court's denial of a lesser-included-offense instruction on felony deadly conduct. We agree with the court of appeals's assessment that, even assuming the denial of this instruction was erroneous, any such error was not harmful to appellant. We, therefore, reject appellant's challenge to this aspect of the court of appeals's

opinion.

**A. Applicable Law**

Because the court of appeals did not reach any decision on whether it was error to deny the lesser-included-offense instruction and based its holding solely on the question of harm, we consider only the legal principles relevant to an assessment of whether appellant was harmed under these circumstances. The erroneous refusal to give a requested instruction on a lesser-included offense is charge error subject to a harm analysis pursuant to *Almanza v. State*, 686 S.W.2d 157, 171 (Tex. Crim. App. 1985) (op. on reh'g); *see Grey v. State,* 298 S.W.3d 644, 648 (Tex. Crim. App. 2009) (citing *Saunders v. State*, 913 S.W.2d 564, 570 (Tex. Crim. App. 1995)). When, as here, the defendant has preserved error by requesting the challenged instruction, we reverse the conviction if the denial of the instruction resulted in some harm to the defendant. *Cornet v. State*, 417 S.W.3d 446, 449 (Tex. Crim. App. 2013). "Some harm" means actual harm and not merely a theoretical complaint. *Id.* at 449-50. To evaluate harm pursuant to *Almanza*, "the actual degree of harm must be assayed in light of the entire jury charge, the state of the evidence, including the contested issues and weight of probative evidence, the argument of counsel and any other relevant information revealed by the record of the trial as a whole." *Almanza*, 686 S.W.2d at 171; *see also Reeves v. State*, 420 S.W.3d 812, 816 (Tex. Crim. App. 2013).

**B. Appellant Was Not Harmed by the Denial of Deadly Conduct Instruction**

Applying the relevant law as set forth above, we agree with the court of appeals's

ultimate conclusion that appellant was not harmed by the trial court's denial of an instruction on felony deadly conduct. Below, we will discuss (1) the entire jury charge, (2) the state of the evidence, and (3) the arguments of counsel, and we conclude based on those considerations that the instant record fails to establish any actual harm stemming from the denial of the instruction.

### 1. The Entire Jury Charge

The jury instruction in this case permitted the jury to find appellant guilty of the charged offense of murder if it found that he "intentionally or knowingly cause[d] the death of Emmanuel Dominguez by shooting Emmanuel Dominguez with a deadly weapon, namely, a firearm," or if he "intend[ed] to cause serious bodily injury to Emmanuel Dominguez, and did cause the death of Emmanuel Dominguez by intentionally or knowingly committing an act clearly dangerous to human life, namely, by shooting Emmanuel Dominguez with a deadly weapon, namely, a firearm." As the court of appeals emphasized in its analysis of this issue, the jury was also charged on, and rejected, the lesser-included offense of manslaughter. The charge on manslaughter stated,

> Our law provides that a person commits the offense of manslaughter if he recklessly causes the death of an individual.
>
> A person acts recklessly, or is reckless, with respect to the result of his conduct when he is aware of but consciously disregards a substantial and unjustifiable risk that the result will occur. The risk must be of such a nature and degree that its disregard constitutes a gross deviation from the standard of care that an ordinary person would exercise as viewed from the defendant's standpoint.
>
> Therefore, if you find from the evidence beyond a reasonable doubt that on or

about the 24ᵗʰ day of May, 2013, in Harris County, Texas, the defendant [ ] did then and there unlawfully, recklessly, as that term is hereinbefore defined, cause the death of Emmanuel Dominguez by shooting Emmanuel Dominguez with a deadly weapon, namely, a firearm, then you will find the defendant guilty of manslaughter.

In contrast to the instructions on murder and manslaughter that were included in the charge, the omitted instruction on felony deadly conduct would have permitted the jury to find appellant guilty of that offense if it found that he "knowingly discharge[d] a firearm at or in the direction of" Dominguez. TEX. PENAL CODE § 22.05(b). Furthermore, as discussed at length above, the jury was properly charged on the law of self-defense and defense of third persons, both of which theories the jury also rejected by finding appellant guilty.[17]

We agree with the court of appeals's assessment that the jury's decision to reject the instruction on manslaughter and find appellant guilty of murder is a consideration that weighs heavily against a finding of harm here. In *Masterson v. State*, we recognized that the jury's "failure to find an intervening lesser-included offense (one that is between the requested lesser offense and the offense charged) may, in appropriate circumstances, render a failure to submit the requested lesser offense harmless." 155 S.W.3d 167, 171 (Tex. Crim. App. 2005) (citing *Saunders*, 913 S.W.2d at 572). We reasoned that the harm from denying a lesser offense instruction stems from the potential to "place the jury in the dilemma of convicting for a greater offense in which the jury has reasonable doubt or releasing entirely from criminal liability a person the jury is convinced is a wrongdoer." *Id.* However, we

---

[17] In addition, the jury received and rejected instructions on the law of defense of property.

acknowledged that that concern may not be present in situations where the intervening lesser offense presents the jury with an available compromise, giving the jury the ability to hold the wrongdoer accountable without having to find him guilty of the charged (greater) offense. *Id.* Although the presence of an intervening offense does not automatically foreclose a finding of harm—because in some circumstances that intervening offense may be the least plausible theory under the evidence—a court "can conclude that the intervening offense instruction renders the error harmless if the jury's rejection of that offense indicates that the jury legitimately believed that the defendant was guilty of the greater, charged offense." *Id.* at 171-72.

The court of appeals applied this reasoning from *Masterson* and concluded that, given the jury's rejection of the second-degree-felony offense of manslaughter in favor of finding appellant guilty of murder, appellant was not harmed by the omission of the instruction on third-degree felony deadly conduct. *Braughton*, 522 S.W.3d at 740. Although this is not our sole consideration in rejecting appellant's complaint, we agree with the court of appeals's reasoning on this matter. As the court of appeals correctly observed, the jury was not placed in the dilemma of either acquitting appellant outright or convicting him of murder. Rather, the jury was provided with the acceptable compromise position of convicting appellant of the lesser offense of manslaughter if it disbelieved that he intended to kill Dominguez or cause him serious bodily injury, but nevertheless believed that he was reckless in bringing about Dominguez's death, in the sense that he was aware of but consciously disregarded a

substantial and unjustifiable risk. By its rejection of manslaughter, the jury signaled its legitimate belief that appellant was not merely reckless in bringing about Dominguez's death and that he did in fact harbor the requisite culpable mental state required for murder—that is, that he either intentionally or knowingly caused Dominguez's death, or intended to cause Dominguez serious bodily injury and intentionally or knowingly shot him. *See* TEX. PENAL CODE § 19.02(b); *Masterson*, 155 S.W.3d at 171-72. Under these circumstances, it is simply not plausible to believe that the jury would have convicted appellant of the even-lesser offense of deadly conduct, which would require a mere finding that appellant knowingly discharged a firearm at or in the direction of Dominguez without any required showing of culpability as to the result in causing Dominguez's death, and without any required showing of an intent to shoot Dominguez. *See* TEX. PENAL CODE § 22.05(b). The entirety of the charge, including the jury's rejection of manslaughter, is a consideration that weighs heavily against a finding of harm stemming from the denial of the instruction on felony deadly conduct.

**2. State of the Evidence**

In addition to the jury's rejection of the intervening offense of manslaughter, we also consider the relevant portions of the evidence in the record. By his own admission in his testimony, appellant acknowledged that he fired his gun at Dominguez from six to seven feet away in response to Dominguez's act of reaching for the satchel on his motorcycle. Appellant then "shot him [Dominguez] as he was coming up." Appellant indicated that he

shot "towards" Dominguez's arm and was not "aiming at a specific area on him." But appellant did acknowledge that he intended to hit Dominguez somewhere on his body, stating that his goal was to stop Dominguez from attacking his family. On cross-examination, the following exchange occurred:

Q: When you shot [Dominguez], you were intending to hit him, correct?
A: I was just pointing at his arm. I just wanted to stop him, like I said, sir.
Q: Well, you had the gun pointed at him and you pulled the trigger, right?
A: Yes, sir.
Q: Did you think that a bullet was going to hit [Dominguez]?
A: Yes, sir.
Q: So you were aware that—you were aware that you were intending to cause serious bodily injury to [Dominguez]?
A: Yes, sir.

To establish harm under these circumstances, the evidence would need to present some plausible basis upon which the jury might have determined that appellant was not guilty of murder or manslaughter, but was nevertheless guilty of felony deadly conduct. But the evidence cited above, when viewed in its totality, contradicts the plausibility of such a scenario. The evidence shows that appellant fired his weapon in the direction of Dominguez at close range; that he intended to hit Dominguez with a bullet; that he aimed approximately for Dominguez's arm; and that he was aware that shooting him would cause Dominguez serious bodily injury. Given the state of appellant's testimony in which he conceded his intent to strike Dominguez with a bullet and acknowledged that that conduct would cause Dominguez serious bodily injury, it is highly improbable that the jury would have harbored a reasonable doubt as to whether appellant had the requisite intent for either murder or

manslaughter (e.g., intent to cause death or serious bodily injury or recklessly causing death).
Absent some evidence that might suggest appellant lacked the culpable mental state to support either of the greater offenses, it is improbable that the jury would have opted to convict him of deadly conduct. The state of the evidence, therefore, also weighs against a finding of harm.

### 3. Arguments of Counsel

A review of the third consideration, the arguments of counsel, indicates that defense counsel's primary defensive strategy focused on self-defense. At various points, counsel indicated that this was an intentional shooting that was justified by appellant's reasonable belief that Dominguez was about to use deadly force against him or his father. But at no point did counsel's arguments suggest that appellant had merely discharged his firearm without intending to hit Dominguez and without intending to injure him. For example, during his opening argument, counsel described the moments preceding the shooting by stating,

> He gets the call, he's out. Hey, what's happening? You're beating my dad up. Stop. I've got a gun. Emmanuel Dominguez: Oh, motherf**ker, you have a gun. Let me show you my gun. And then he reaches to the saddlebag of his motorcycle, and that is when [appellant] shoots one time as [Dominguez is] coming back up. . . . There's no hands up. There's a reaching down. That's self-defense.

During his closing argument, counsel again emphasized his position that appellant's shooting of Dominguez was done intentionally but was justified by self-defense. Counsel stated,

So Chris, Jr. goes out originally for his dad, protecting him, the third person knocked on the ground. What's going to happen next? "Stop, I have a gun. Stop, I have a gun." Oh, you have a gun, MF. Let me show you my gun. Turn to the bike, saddlebags, open, reach. What's going on in Chris, Jr.'s mind? Oh-oh, he's grabbing something, a weapon. Something he's got there. I can't see it, but he said what he has. Then the law excuses or justifies such person in resorting to deadly force by any means at his command to the degree that he reasonably believes immediately necessary viewed from his standpoint at the time.

At the conclusion of his closing argument, counsel stated,

So when you see the self-defense [instructions] there, I think this case is clearly self-defense based on the evidence. . . . We have got a situation where—you know, throughout life we're all faced with situations where we're scared, where there's uncertainty. How do we react? What's expected of us? What are we supposed to do? You know, what do you do when your father, mother, and little brother are in harm's way? Stand there with a stranger. Uh-huh. You have to react. You know, that tells who you are. Everybody faces the fear. Cowards, heroes, we all face the fear, but how you react to it tells us who you are.

Counsel repeatedly indicated that appellant had shot at Dominguez in a split second while believing him to be reaching for a weapon. The key issue in this case, as counsel observed, was whether appellant's belief was reasonable. By contrast, counsel did not appear to make any argument that appellant fired his gun in Dominguez's direction without intending to strike him. While it is true that, at one point during closing argument, counsel suggested to the jury that appellant lacked the required culpable mental state to be found guilty of murder, even then counsel acknowledged that appellant had intentionally pulled the trigger while aiming his gun at Dominguez's arm, which would have established

manslaughter if the jury had believed that assertion.[18] Given counsel's focus on self-defense as the primary issue in this case, the arguments of counsel also weigh against a finding of harm here.

In sum, in light of the foregoing considerations, we conclude that the record fails to show that appellant suffered actual, as opposed to theoretical, harm due to the absence of the omitted instruction on felony deadly conduct. There is no realistic possibility that the jury would have opted to convict appellant of felony deadly conduct had it received an instruction on that offense. We uphold the conclusion of the court of appeals as to this issue, and we overrule appellant's third ground for review.

## IV. Conclusion

We uphold the court of appeals's conclusions with respect to both the sufficiency of the evidence to support the jury's rejection of appellant's defensive claims and its analysis of appellant's complaint of jury-charge error. Accordingly, we affirm the judgment of the court of appeals.

Delivered: December 19, 2018

Publish

---

[18] Specifically, counsel stated that appellant "did not admit he murdered, intentionally killed Emmanuel Dominguez. Pulling the trigger and intentionally killing are two different things." Counsel further suggested to the jury that appellant had only intended to shoot "towards his [Dominguez's] arm," and that, on this basis, "really, it's not a murder case" because the killing was not intentional or knowing.