

COURT OF APPEALS
EIGHTH DISTRICT OF TEXAS
EL PASO, TEXAS

| | | |
|---|---|---|
| LUIS PEDREGON, | § | No. 08-18-00119-CR |
| Appellant, | § | Appeal from the 205th |
| v. | § | Judicial District Court |
| STATE OF TEXAS, | § | of El Paso County, Texas |
| Appellee. | § | (TC# 20170D01684) |

## **O P I N I O N**

In this aggravated assault case, we face the always difficult task of assessing whether error in the jury charge--here conceded by the State--caused some harm to the defendant's rights. Assessment of harm is highly case specific and requires a close examination of what happened during the complete course of the trial. Having made that assessment, we conclude that Appellant Luis Pedregon was not actually harmed by the jury charge error of which he complains. We therefore affirm the judgment of conviction.

## I. BACKGROUND

Appellant was indicted on one count of aggravated assault with a deadly weapon in a four-part indictment. The prosecution arose out of an incident in April 2016 whereby Appellant physically assaulted Pablo Lara in a parking lot. During the assault, Appellant broke Lara's nose

1

and central to the State's case, attempted to asphyxiate Lara with a rope. Prior to trial, the State elected to proceed under two paragraphs of the indictment, charging that Appellant committed aggravated assault with a deadly weapon either by, (1) causing bodily injury or by, (2) threatening imminent bodily injury. At trial, Lara, Appellant, and several fact witnesses outlined the following series of events.

## A. Evidence of the Assault

Ultimate Tactical Gear Supply sells law enforcement uniforms and equipment. Appellant was a frequent customer at the store. Lara also went to the store, sometimes to buy clothing, and sometimes to try and sell items to the store's manager. On April 26, 2016, both Appellant and Lara were at the store. How they got into a fight that day was disputed; the fact that there was an altercation is not. At trial, the State introduced a surveillance video that captured Appellant on top of Lara in the store's parking lot, with his hands around Lara's head and neck area.[1]

The jury had to decide between two diametrically opposed stories as to how the struggle began. Lara testified that he had seen Appellant in the store before but had never had an interaction with him. On the day in question, Appellant greeted him as he entered the store, and then thanked him for coming as he left. As Lara mounted his motorcycle in the parking lot, he saw a yellow rope come over his head and go around his neck, and heard Appellant say, "I want to put this on your neck." Appellant then started hitting Lara. The motorcycle fell on top of Lara, leaving him on the ground with Appellant on top of him. Lara testified that Appellant broke his nose before using the rope to pull him up to standing position.

---

[1] The surveillance video, retrieved from the business next door, did not record the entire interaction between Appellant and Lara. The recording began at the point when Appellant was already on top of Lara. Testimony indicated that the video system is motion activated and does not record unless there is sufficient movement to trigger the motion sensor.

Lara testified that the tension of the rope restricted his ability to breathe, so he fell back onto his knees and began crawling. Appellant next jumped on top of him and pulled on the rope, asking, "Who's the *mariquita* [ladybug] now?" and, "Who stole my knife?" Appellant then placed his legs on Lara's arms, pinning him flat against the parking lot surface, and tightened the rope around Lara's neck so that he could not breathe. At that moment, the store manager exited the store and Lara asked for help. The manager told Appellant to leave, while Lara waited for law enforcement to arrive. Appellant can be seen running away from the store on another video clip from the security camera.

Appellant's story was quite different. He claims that Lara had been in the store some weeks earlier trying to sell a canvas oil painting. Appellant made a comment about the need to have the painting appraised, which Lara took the wrong way. Appellant had also told the store manager that Lara had stolen Appellant's knife several weeks prior. Appellant's defense was that he acted in self-defense. He claimed that as Lara was leaving the store, Lara told him, "I'm going to mess you up." Appellant purposefully followed Lara out of the store with the rope in his hand and attempted to "detain him." Appellant admitted at trial that he had bought the yellow cord from the store that day and attached a rope handle to the end of the rope. According to Appellant, Lara swung first, and the fight began.

Appellant testified that he was on top of Lara when the motorcycle fell over, and he tried to wrap Lara's hands with the rope. At one point during his testimony Appellant stated that he did not place the rope around Lara's neck. At another point, he said that the rope wound around Lara's neck because Lara acted like a "cat play[ing] with string" while Appellant was on top of him with the rope. Appellant also testified that he never pulled on the rope to asphyxiate Lara, but only pulled on Lara's collar.

For his part, Lara denied that he did anything to incite Appellant. The store manager testified that when he went outside, he saw Appellant and Lara on the parking lot pavement. He did not recall seeing the rope around Lara's neck. But the State introduced photos of Lara that showed a ligature mark around his neck and his bloodied face. The State also introduced the rope into evidence. Lara explained how Appellant used a handle affixed to the end of the rope to squeeze the cord tighter during the assault. Lara also narrated the surveillance video, indicating where Appellant tightened the rope around his neck.

## B. The Jury Charge

As noted above, the indictment alleged that Appellant committed an aggravated assault with a deadly weapon in two ways: by causing bodily injury, and by threatening to do so. Appellant filed a motion to require the State to elect which theory it would proceed to on verdict. The trial court overruled that motion and submitted both theories. And over the State's objection, the trial court also instructed the jury on the issue of self-defense. The jury charge thus contained the following application paragraph:

> If you find from the evidence beyond a reasonable doubt, that on or about the 26th day of April, 2016, in El Paso County, Texas, that the Defendant, LUIS PEDREGON, did then and there intentionally or knowingly or recklessly cause bodily injury to Pablo Lara, by tightening a rope around the neck of Pablo Lara and the said Defendant did then and there use or exhibit a deadly weapon, to wit: a rope, that in the manner of its use or intended use was capable of causing death or serious bodily injury, during the commission of or immediate flight from said assault,
> ### OR
> If you find from the evidence beyond a reasonable doubt that on or about the 26th day of April 2016, in El Paso County, Texas, the Defendant, LUIS PEDREGON, did then and there, intentionally or knowingly threaten Pablo Lara with imminent bodily injury and did then and there use or exhibit a deadly weapon during the commission of said assault, to wit: rope, that in the manner of its use and intended use was capable of causing death and serious bodily injury,
> ### AND
> You are further instructed, however, that if you find from the evidence beyond a reasonable doubt that at the time and place in question Pablo Lara, was not using or attempting to use unlawful deadly force on the Defendant nor a third person, or

4

that the Defendant did not reasonably believe that neither he nor a third person was in danger of death or serious bodily injury, or that a reasonable person in the Defendant's situation at the time and place in question would not have reasonably believed that neither he nor a third person were in danger of death or serious bodily injury by the words or conduct of Pablo Lara, then you will find Defendant LUIS PEDREGON **Guilty** of aggravated assault with a deadly weapon as charged in the Indictment.

Unless you so find from the evidence beyond a reasonable doubt, or if you have a reasonable doubt thereof, you will find the Defendant LUIS PEDREGON **Not Guilty.**

The jury convicted Appellant of aggravated assault with a deadly weapon and sentenced him to 10 years' incarceration and a $3,500 fine. This appeal followed.

## II. ISSUES ON APPEAL

In his first issue, Appellant contends that the trial court provided an erroneous jury instruction that did not require the jury to return a unanimous verdict concerning whether he was guilty of (1) aggravated assault with a deadly weapon by causing bodily injury or (2) aggravated assault with a deadly weapon by threat. In his second issue, Appellant argues that he was harmed by the jury-charge error, which he properly objected to. Appellant's issues follow our accepted paradigm for review of jury-charge error: we first determine if the instruction was erroneous, and if so, we next determine whether the error caused sufficient harm to warrant reversal. *Almanza v. State*, 686 S.W.2d 157, 171 (Tex.Crim.App. 1985) (en banc) (op. on reh'g). We address each issue in turn.

## III. THE TRIAL COURT PROVIDED AN ERRONEOUS JURY INSTRUCTION

### A. Controlling Law

Texas law requires that a jury reach a unanimous verdict on each statutory element of a charged offense. *French v. State*, 563 S.W.3d 228, 233 (Tex.Crim.App. 2018), *citing* TEX.CONST. art. V § 13; *Jourdan v. State*, 428 S.W.3d 86, 94 (Tex.Crim.App. 2014). The jury must agree that

5

the defendant committed one crime. *See Landrian v. State*, 268 S.W.3d 532, 535 (Tex.Crim.App. 2008). Jury unanimity is not violated when the jurors can choose among various "alternative manner and means of committing the same statutorily defined offense." *Jourdan*, 428 S.W.3d at 94. But if the charge includes distinct offenses submitted in the disjunctive, the charge should inform the jury that they must unanimously agree on at least one the offenses. *Ngo v. State*, 175 S.W.3d 738, 745 (Tex.Crim.App. 2005) (en banc) ("Unanimity in this context means that each and every juror agrees that the defendant committed the same, single, specific criminal act.").

A person commits an assault if they *either*, (1) intentionally, knowingly, or recklessly causes bodily injury; *or* (2) intentionally or knowingly threaten another with imminent bodily injury. TEX.PENAL CODE § 22.01(a)(1)-(2). Section 22.02 then defines an aggravated assault, in pertinent part, as being an assault under section 22.01, and the person "uses or exhibits a deadly weapon during the commission of the assault." *Id.* § 22.02(a)(2).

The Court of Criminal Appeals has recognized that a "bodily injury" assault is a separate and distinct criminal offense from assault by "threat." *See Landrian v. State*, 268 S.W.3d 532, 540 (Tex.Crim.App. 2008). By extension, the court indicated that an aggravated assault by causing bodily injury is a separate and distinct crime from an aggravated assault by threat. *See id.* The former is a result-oriented offense, while the latter is a conduct-oriented offense. *See id.*

**B. Analysis**

At trial, the State sought to prove an aggravated assault with a deadly weapon two ways: by causing bodily injury or by threat. And because the charging instrument sought one conviction by demonstrating the elements of two separate offenses, the jury should have been instructed that it must *unanimously* agree that Appellant was guilty of at least one of the offenses before it could return a guilty verdict. *See id.* at 539. This charge failed to do so, and the State concedes that

6

point. We also agree that the circumstances in Appellant's case demonstrate jury-charge error because the trial court did not instruct the jury that it must unanimously decide at least one of the disjunctively submitted offenses. *See Ngo*, 175 S.W.3d at 749 (finding that appellant was denied his right to a unanimous verdict in a prosecution where the State charged three separate offenses of credit card abuse in three paragraphs within a single-count indictment). We sustain Issue One.

## IV. APPELLANT FAILS TO SHOW HARM

Finding error in the jury instruction begins, rather than ends, our inquiry. "Not all jury-charge errors require reversal." *Reeves v. State*, 420 S.W.3d 812, 816 (Tex.Crim.App. 2013); *see Almanza*, 686 S.W.2d at 174 (noting that automatic reversal is not warranted for every jury-charge error). We must conduct an evidentiary review of the record as a whole to gauge the actual harm to Appellant. *See Almanza*, 686 S.W.2d at 174. In Issue Two, Appellant argues that he properly objected to the erroneous jury instruction and suffered some harm to warrant reversal. The State maintains that the record does not demonstrate that Appellant was harmed.

### A. Standard of Review

The lens through which we conduct our harm analysis depends upon whether Appellant raised a jury unanimity objection at trial. If Appellant objected, reversal is proper if the error caused the defendant "some harm." *Id.* at 171; *Jordan v. State*, No. PD-0899-18, 2020 WL 579406, at *4 (Tex.Crim.App. Feb. 5, 2020). "Some harm" means actual harm and not a theoretical complaint. *See Jordan*, 2020 WL 579406, at *5. If the defendant did not object at trial, a reversal is warranted only if the error caused egregious harm. *Id.* at 4.

In either situation, we assess the actual degree of harm in light of the, (1) entire jury charge; (2) entirety of the evidence, including the contested issues and weight of probative evidence; (3) arguments of counsel; and (4) any other relevant information present in the record. *See Almanza*,

686 S.W.2d at 171; *Reeves*, 420 S.W.3d at 816. Neither party bears a burden of proof or persuasion in an *Almanza* harm analysis. *See Warner v. State*, 245 S.W.3d 458, 464 (Tex.Crim.App. 2008).

The State argues that we should apply *Almanza*'s egregious harm standard of review, because Appellant's objection in the trial court did not preserve the issue raised in this appeal. Specifically, the State maintains that Appellant's motion to require an election by State does not comport with his argument on appeal. We disagree. A defendant's "objection to an erroneous jury charge need not constitute a paragon of clarity and specificity in order to trigger [*Almanza*'s] some harm analysis." *See French*, 563 S.W.3d at 235. Appellant preserved error under *Almanza* if his objection was specific enough to alert the trial court that the charge allowed the jury to be non-unanimous concerning the way in which the offense was committed. *See id.* (noting that appellant's objection was sufficient because, at the very least, it alerted the trial court that the unanimity instruction contained an error of some kind).

Appellant's objection did just this. Appellant's motion to require election by the State argued that the State must elect what specific offense of aggravated assault with a deadly weapon it would prosecute, in order to ensure a unanimous verdict, and counsel orally urged this objection to the trial court. The motion also argued that the State must elect in order to minimize the risk that the jury would convict because of the charged crimes collectively, rather than because one crime was proven beyond a reasonable doubt. Considering Appellant's written motion and oral argument to the trial court, we conclude that his objection was at least specific enough to alert the trial court that the application paragraph contained some kind of error with respect to a juror unanimity issue. *See id.* Appellant preserved error, and we apply *Almanza*'s "some harm" analysis on review. *See id.*

8

**B. Consideration of the *Almanza* Factors**

Even the less exacting standard of some harm requires the record to demonstrate that the inclusion of the erroneous jury instruction caused actual, and not merely theoretical harm. *See id.* Appellant argues that the erroneous instruction caused some harm because the evidence did not demonstrate that he committed one of the charged offenses exclusively, and the remainder of the jury charge, and the record did not ameliorate the problem. The State maintains that the instruction did not cause actual harm because the evidence, arguments, and voir dire focused on aggravated assault with a deadly weapon causing bodily injury, and the jury rejected Appellant's central defensive theory of self-defense. We agree with the State and conclude that the record does not demonstrate that Appellant suffered some harm as a result of the jury-charge error.

### 1. The entire jury charge

In assessing this first factor, we look for anything in the balance of the jury charge that either exacerbated or ameliorated the error. *See French*, 563 S.W.3d at 236. After examining the entire jury charge, we conclude that nothing exacerbated the error. *See id.* The instructions begin with general principles laid out in easy-to-comprehend terms. Instructions concerning the applicable law follow, including definitions for aggravated assault with a deadly weapon and self-defense. We set out the text of the application section above. The general principles section instructs that the verdict must be unanimous:

> You may return a verdict only if all [12] of you agree on this verdict. This is not to say that you should surrender your personal belief as to whether the State has proven the Defendant guilty beyond a reasonable doubt or not as to any particular count, but that you should only return a verdict if the verdict is unanimous.

Appellant maintains that this unanimity instruction exacerbated the error because it contains the words "any particular count." We disagree. The mandate for jurors to not surrender their personal belief as to Appellant's guilt of any particular count, if anything, tends to ameliorate

9

rather than exacerbate the jury-charge error, as we presume that the jury followed the written instructions. *See Miles v. State*, 204 S.W.3d 822, 827-28 (Tex.Crim.App. 2006) (noting that, in the absence of evidence to the contrary, a reviewing court assumes the jury followed its written instructions). As such, this factor does not weigh in favor of a finding of some harm. *See French*, 563 S.W.3d at 235.

### 2. *The entirety of the evidence*

The second category for an *Almanza* analysis requires the reviewing court to consider the entire record, including the contested issues and weight of probative evidence, to determine whether the evidence made it more or less likely that the instruction caused Appellant some harm. *See Almanza*, 686 S.W.2d at 171. Relative to this factor, two considerations weigh heavily against Appellant. First, the record contains no, or almost no evidence of an aggravated assault by threat, which militates against the possibility some jurors convicted based on the threat theory and some convicted on the injury theory. Second, Appellant's defensive theory at trial centered on self-defense, and not a denial of the aggravated assault.

As to the first consideration, we parallel the facts in this case to those in *French v. State*. *French* involved the same argument that Appellant advances here: two distinct crimes were submitted in the disjunctive and it was possible the jury was not unanimous in its general verdict as to which crime it convicted on. The crime at issue in *French* was aggravated sexual assault of a child. 563 S.W.3d at 232. The defendant there was charged with committing two distinct acts against the child, each of which were classified as distinct offenses. *Id*. at 233. The jury convicted the defendant, but the intermediate court noted the same error we identify here and found the error harmful. *Id*. at 232. The Texas Court of Court of Criminal Appeals, however, disagreed and reversed, finding no harmful error. The crux of its analysis was that there was an abundance of

10

evidence germane to one of the charged offenses, but little to none for the other.[2] *Id.* at 236-39. We view our record in the same way.

The testimony in our case contains virtually nothing about the threat theory. At most, Lara testified to this statement by Appellant:

> [LARA]: I stopped the motorcycle and I ask -- I turned my head to the right side and I say to this person, "What are you trying to do?" And he say, "I want to put this on your neck."
>
> [PROSECUTOR]: And when he said, "I want to put this on your neck," did you know what he was talking about?
>
> [LARA]:. Yeah, about the rope.

Another brief reference to the statement is repeated in Lara's cross-examination:

> [DEFENSE COUNSEL]: "Here wait. Let me put this around your neck"?
>
> [LARA]: Yes.
>
> [DEFENSE COUNSEL]: So he said that to you in Spanish?
>
> [LARA]: Yes.

In the sequence of Lara's testimony, he first stated that the rope came over his head and around his neck. He then related the statement about "I want to put this on your neck." If the statement came after the rope was around Appellant's neck, it was less a verbal threat, and more a description of what had already occurred. And nothing about the statement directly threatens an injury. By contrast, the jury heard a great deal of evidence about an actual aggravated assault causing physical injury.

Lara testified that Appellant threw a yellow rope around his neck and began hitting him as he was on his motorcycle attempting to leave the store parking lot. He indicated that Appellant broke his nose and got on top of him as he crawled, choking him with the rope. Finally, Lara

---

[2] One offense involved penetration of the child's anus, and the other penetration of the child's sexual organ. The child testified to multiple occasions of the former, but as to the latter, had only claimed penetration of her sexual organ to a nurse, but quickly recanted that allegation, claiming she was mistaken. *French v. State*, 563 S.W.3d 228, 236-238 (Tex.Crim.App. 2018).

11

testified that Appellant pinned him flat against the parking lot surface and tightened the rope around his neck so that he could not breathe. Lara explained how Appellant used the rope handle affixed to the end of the rope to squeeze the paracord tighter around his neck.

The State introduced photographs of Lara's head taken shortly after the assault, which depicted multiple lacerations, blood running down his nose, and asphalt debris across his forehead, both cheeks, and chin. Additional photographs documented ligature marks around Lara's neck, and the yellow paracord with a rope handle affixed to the end laying on the parking lot surface next to Lara's motorcycle.

Appellant testified that he purchased the yellow rope just prior to the incident and affixed the handle that day. Appellant admitted that he followed Lara out of the store with the rope in his hand. He grabbed Lara, and they started fighting, because he "was trying to detain" Lara. Appellant stated that he "got on top of" Lara, "rolled him around" and "pulled [Lara] on his back." While Appellant was on top of Lara, he testified that he "started wrapping [Lara's] hands up in the rope."

Appellant further testified that the fight occurred after his "training instincts" kicked in from working in "detainee operations," and "if [he] was mad, [Lara] would be dead." Appellant did not deny that he was on top of Lara while Lara was on his hands and knees with the rope around his neck and indicated this occurred because Lara was being "uncooperative." At one point, Appellant acknowledged that the rope was around Lara's neck during the fight and that it caused the ligature marks, explaining, "[i]n a scuffle, things happen," and "[w]hen you struggle against something, sometimes you get marks."

Appellant argues that the evidence of whether the rope was actually around Lara's neck is disputed (the store manager could not recall if he saw it or not, the video camera was positioned

12

far away, and Appellant denied intentionally placing the rope around Lara's neck). But the question is not whether the evidence of an aggravated assault by causing injury was disputed, but whether the jury had two alternatives to pick between and could have split its vote with some finding assault by causing injury, and some by threat. Because the evidence of threat was so thin, if not non-existent, we fail to see the likelihood of harm.

This conclusion is buttressed by the defense Appellant urged at trial. Appellant presented a theory of self-defense which presupposes his admission of the underlying offense. *See Jordan*, 2020 WL 579406, at *1; *Gamino v. State*, 537 S.W.3d 507, 511-512 (Tex.Crim.App. 2017). Self-defense is a "confession and avoidance" defense, meaning a defendant is not entitled to a self-defense jury instruction unless he admits to the alleged conduct, although not necessarily every element. *See id* at 511-512. A defendant cannot invoke both self-defense and flatly deny the charged conduct. *See Jordan*, 2020 WL 579406, at *1; *see also Villarreal v. State*, 453 S.W.3d 429, 437 (Tex.Crim.App. 2015). During the jury charge conference, the court found that Appellant admitted to sufficient conduct alleged in the indictment to entitle him to the defense.

That admission was corroborated by, (1) the testimony of Lara, (2) the weapon discovered at the scene, (3) the photographs and video recorded at the time of the assault, and (4) Appellant's own testimony. By finding Appellant guilty, the jury indicated that it believed Appellant committed the offense and that it disbelieved the self-defense claim. *See Braughton v. State*, 569 S.W.3d 592, 609 (Tex.Crim.App. 2018) (noting that a jury verdict of guilty is an implicit rejection of the defendant's self-defense theory), *citing Saxton v. State*, 804 S.W.2d 910, 913-14 (Tex.Crim.App. 1991) (en banc). The point here is that case was much less about whether an assault by threat occurred, and more about a claim of self-defense to an admitted physical struggle.

13

So charge error directed at a nominal facet of the trial does not show harm. *See French*, 563 S.W.3d at 235.

### 3. The arguments of counsel

In analyzing arguments, a reviewing court also determines whether any statements made by the parties exacerbated or ameliorated error in the charge. *See Arrington v. State*, 451 S.W.3d 834, 844 (Tex.Crim.App. 2015). We conclude that this factor weighs neither in favor of nor against a finding of some harm, because the parties did not add to the charge error by telling the jury that it did not have to be unanimous with respect to the its verdict. *Cf. id.* (concluding that the factor weighed neither in favor nor against an egregious harm finding when neither party addressed unanimity during argument) *with Ngo*, 175 S.W.3d at 750 (finding egregious harm in part because the State informed the jury during closing argument that it need not be unanimous in its verdict). The State's closing argument emphasized that the evidence demonstrated the elements of aggravated assault with a deadly weapon causing bodily injury. Neither party's closing argument addressed the elements of aggravated assault with a deadly weapon by threat.[3] While both parties addressed the law and evidence concerning self-defense during closing, neither party mentioned the unanimity instruction or the erroneous jury charge. Neither party invited the jury to convict Appellant without agreeing as to which criminal offense he committed. *See id.*

### 4. Other relevant information contained in the record

In considering the final *Almanza* factor, we examine the complete record, including voir dire and opening statements. *See French*, 563 S.W.3d at 236. Neither party discussed juror unanimity during voir dire or opening statements. Likewise, neither party discussed the elements

---

[3] The State once mentioned that Appellant stated to Lara, "I'm going to put this rope around your neck" during argument. The prosecutor did not use the statement to support the assault by threat theory but discussed it in the context of the witness credibility.

14

of aggravated assault by threat. During voir dire, the State explained that it had to prove the elements of aggravated assault causing bodily injury beyond a reasonable doubt and detailed those elements for the jurors. The State's opening statement focused on the elements of aggravated assault with a deadly weapon by causing bodily injury, emphasizing that Appellant attacked and tried to strangle Lara. Upon reviewing the complete record, we conclude that the jury was never told, by any party or the trial court, that it need not return a unanimous verdict. As such, nothing militates in favor of finding some harm. *See id*. at 235.

After considering the charge error in light of all of the *Almanza* factors, we conclude that the record, as a whole, does not demonstrate that Appellant suffered some harm from the jury instruction. When the record demonstrates a risk of harm so small that it may be characterized as not "remotely significant," or where the risk of harm is "highly unlikely" as to be "almost infinitesimal," the harm resulting from the jury-charge error is only theoretical harm. *See id*. at 239. As such, we overrule Issue Two.

We note that the trial court certified Appellant's right to appeal in this case, but the certification does not bear Appellant's signature indicating that he was informed of his rights to appeal and to file a pro se petition for discretionary review with the Texas Court of Criminal Appeals. *See* TEX.R.APP.P. 25.2(d). We thus find that the certification is defective and has not been corrected either by Appellant's attorney, or the trial court.

To remedy this defect, the Court ORDERS Appellant's attorney, pursuant to TEX.R.APP.P. 48.4, to send Appellant a copy of this opinion and this Court's judgment, to notify Appellant of his right to file a pro se petition for discretionary review, and to inform Appellant of the applicable deadlines. *See* TEX.R.APP.P. 48.4, 68. Appellant's attorney is further ORDERED, to comply with all the requirements of TEX.R.APP.P. 48.4.

15

# V. CONCLUSION

Finding that the trial record as a whole does not demonstrate that Appellant suffered some harm as a result of the jury charge, we affirm the trial court's judgment.

JEFF ALLEY, Chief Justice

March 10, 2020

Before Alley, C.J., Rodriguez, and Palafox, JJ.

(Do Not Publish)