In The

*Court of Appeals*

*Ninth District of Texas at Beaumont*

_____

**NO. 09-23-00060-CR**
_____

**ZACHARY KAPEL, Appellant**

**V.**

**THE STATE OF TEXAS, Appellee**

**On Appeal from the Criminal District Court**
**Jefferson County, Texas**
**Trial Cause No. 20-34473**

**MEMORANDUM OPINION**

A grand jury indicted Appellant Zachary Kapel for murder, for intentionally and knowingly causing the death of Shane Jones by shooting him with a deadly weapon, namely a firearm. Kapel pleaded not guilty, but a jury found him guilty as charged and assessed punishment at sixty-five years' imprisonment and a fine of $10,000. On appeal, Kapel challenges the sufficiency of the evidence to support the jury's rejection of Kapel's argument that he acted in self-defense. We affirm.

## Evidence at Trial

### Testimony of "Anna"[1]

Anna testified that on April 26, 2020, she was visiting her friend Fred at his home on Stone Town Road. At that time, Shane Jones was living in a camper on Fred's property. According to Anna, at the time of the shooting, Hope was also at Fred's property, Hope was romantically involved with Zachary Kapel, and Anna heard Hope call Kapel to come pick her up. Anna testified that Hope asked Shane for permission to have Kapel pick her up because Shane would not allow Kapel on the property because Shane and Kapel were fighting about Hope and about some money that was owed. Anna recalled that sometimes Hope would "escape from Zach's abuse by going over to Shane's." Shane agreed that Kapel could come pick up Hope provided Kapel stayed "on the street, down the road[,]" but he could not enter the gate or onto the property. Anna agreed there was a long, private driveway on Fred's property, which led to the location where Shane lived.

According to Anna, Shane let Anna sit inside his camper while he went to the store, and as Shane was leaving, he was in a good mood, and he was holding a T-shirt. Anna testified that Shane was not carrying a firearm, knife, club, bat, pipe wrench, nor anything else that could cause harm to another person. Anna further

---

[1] We use pseudonyms to refer to civilian witnesses who are not affiliated with law enforcement.

testified that after Shane turned to leave, Anna sat down on the steps, she heard Kapel's truck pull in, and then she heard "a little yelling and [] a loud bang." After she heard arguing, Anna also saw Kapel's truck. According to Anna, she could not hear what the arguing was about. Anna testified that the bang occurred immediately after the arguing. Anna recalled that she saw Kapel standing over Shane "hollering at him[,]" repeatedly saying, "I told you this was going to happen[,]" and it looked like Kapel had a firearm in his hand.

Anna recalled that, at that point, Kapel started walking toward the camper and she was scared. Anna testified that Hope was yelling, "I can't believe you killed him[,]" and Kapel replied, "What else did you think was going to happen? I told you this was going to happen." According to Anna, Hope was hollering at the neighbors to call 911, and Hope was trying to stop Kapel from leaving. Anna testified that Kapel wanted to leave, he wanted Hope to leave with him, Hope stood in front of his truck to try to keep him from leaving as Kapel pulled out, Hope told Kapel to stay and wait for the police, and eventually Hope moved out of the way of Kapel's truck. According to Anna, Kapel left, the police arrived, and it was "a good while" before Kapel returned to the scene. Anna testified that she saw the wounds that Shane sustained. She did not see a weapon, knife, wrench, or pipe near or around his body. According to Anna, when the shooting occurred, Kapel's vehicle was "well into" the property.

Anna explained that at one time, Kapel and Shane were friends, but at some point, they had a falling out after Kapel sold some of Shane's things and Kapel was seeing Shane's girlfriend while Shane was in jail. Anna recalled that a few days before the shooting, Shane confronted Kapel when she and Kapel were delivering a mattress to Fred, who lived on the same property as Shane, Shane was not happy that Kapel was at his residence, and Shane told Kapel, "I told you not to come over here to my house." Anna recalled that Shane accused Kapel of stealing from him and the two men had a brief physical fight.

Anna testified that her friend Jack waited with her while she was waiting for the police to arrive, and that Jack was deceased at the time of trial. Anna recognized the knife pictured in State's Exhibits 77 through 80 as Jack's knife, which she recognized because Jack liked to wrap the handle of his knife.

On cross-examination, Anna testified that she knew that Shane used methamphetamine, but she was not aware whether Shane had used it on the day of the shooting. According to Anna, Shane did not become mean when using methamphetamine. Anna remembered telling a detective that Kapel told Shane, "I told you this would happen." Anna also recalled telling the police that she heard a click before the gunshot. Anna agreed that the disagreement between Shane and Kapel related to Kapel stealing from Shane and also that Kapel sold Shane "some fake drugs[]" and Shane wanted his money back.

4

Anna agreed that the photographs in Defendant's Exhibits 1 and 2 show a wrench sitting on the seat of Jack's car. On redirect, Anna testified that, after the shooting, she did not see Jack walk up to Shane's body, pick something up, and then put it in his vehicle. She also testified that, after the shooting, Kapel was not "freaking out[,]" he acted "[l]ike it was okay to do that[,]" and "[a]ll he cared about was leaving." Anna further testified that Kapel did not say anything about calling 911, the police, nor an ambulance to get Shane some help. On recross, Anna agreed she knew that Kapel had called 911 shortly after he left the property and that he had returned to the property later.

Testimony of "Paul"

Paul testified that he lived next to Fred's property on Stone Town Road. Paul recalled that on April 26, 2020, he was doing some painting on his property, and he could hear several people at Fred's property "screaming, hollering, [and] cussing." Paul's friend Jonah was with Paul, and Jonah said to him, "you hear that? [] [S]omething is going to happen over there." And then Paul and Jonah heard a shot, and they heard someone scream. According to Paul, Jonah ran over to Fred's property, and when he returned, he said, "call 911, the man is dead on the ground. [] He shot him." Paul testified that he called 911. Paul also testified that he walked to the neighboring property and saw the body, and he did not see a weapon, gun, or knife near the body. Paul recalled that the police and first responders arrived in about

5

five minutes. Paul identified the defendant, Zachary Kapel, as the person who drove a white truck away from the property after the shooting. Paul testified that he knew Fred owned a gun, and he believed that Fred was a "dopehead." On cross-examination, Paul testified that he did not see the shooting, but he did see one of the women trying to stop the white pickup truck from leaving.

Testimony of "Jonah"

Jonah testified that he visits Paul at his property on Stone Town Road from time to time, and he was fishing at Paul's on April 26, 2020, while Paul was painting. Jonah recalled hearing a firearm discharge that afternoon, and he also heard arguing and screaming at the property next door. Jonah testified that after he heard the gunshot, he walked next door and saw a truck in the driveway, a guy trying to get into the truck, and a screaming woman trying to stop the man from getting into the truck. Jonah asked if everything was okay, and the man gave a thumbs-up and said, "Yeah. Everything is fine now[,]" but the woman said, "No. Call 911. Someone has been shot." Jonah identified the defendant as the man who was trying to get into the truck and drive away. According to Jonah, the man's only concern seemed to be that he was being held back and he did not seem concerned for the person who was shot. Jonah explained that he ran back to Paul's property and told him to call 911 because someone had been shot. Jonah recalled that the woman was trying to keep the defendant at the scene that afternoon, but the defendant ultimately left the scene in

6

the truck. At some point, Jonah saw the white truck come back after the police had arrived.

Testimony of Sergeant Shawn Tolley

Sergeant Shawn Tolley testified that he supervises the 911 operations center for the Beaumont Police Department, and he also serves as a custodian of records. Tolley testified that all calls are routinely recorded as they are received, and the recorded calls are stored for at least five years. Tolley identified State's Exhibits 11 and 12 as recordings of 911 calls in connection with this case. The recordings were published to the jury. Exhibit 11 includes two calls in which the callers report that someone was shot and that someone drove away in a white pickup truck. Exhibit 12 is a call from Kapel to 911, in which Kapel tells dispatch that a man slammed his vehicle door on Kapel's legs and Kapel shot the man in the chest with a rifle. Kapel also tells 911 dispatch that he knew the name of the person whom he shot, but the person was not his friend, and the person was "a violent person" who was "in and out of prison." Kapel tells 911 dispatch that he is on his way home to get cleaned up, and dispatch instructs him to return to the scene.

<u>Testimony of Officer John Woods</u>

Officer John Woods testified that he was dispatched to an address on Stone Town Road on April 26, 2020, regarding a call about a shooting victim. Woods testified that when he and another officer entered the property, they saw a man lying face down and the man appeared to be deceased. According to Woods, the property was "fairly large" with several buildings, campers, and vehicles, and the officers started checking the property for suspects or threats. Woods testified that, when EMS arrived, they turned the man's body over, which revealed that he had an "extensive and traumatic[]" wound to his chest. According to Woods, one of the EMS personnel identified another wound on the man's side near his armpit.

At some point, Woods saw a white truck driving down the road towards him. According to Woods, he told the driver of the white truck to move along, and the driver said he was the person who shot the victim. Woods drew his service weapon and told the driver to stop the truck, and he summoned other officers for assistance. Woods identified the defendant as the driver of the white truck. Woods testified that the defendant's truck had several defects and the driver's door would not open from the outside. Woods further testified that the defendant told the officers that the gun was in the back of the vehicle.

Officer Woods identified State's Exhibits 32 through 43 as photographs taken at the scene that day, depicting the defendant's truck with an area on the driver's

8

side outside of the truck covered in blood and a hole near a window that appeared to have been made by a projectile. According to Woods, there was no blood or blood splatter inside the truck. In Woods's opinion, the victim was "very close to the truck when he was shot[,]" the victim would have been outside of the truck, and it appeared that the bullet came from inside the truck.

Woods agreed his body camera was activated while he was investigating the scene. Woods recalled that call notes on the incident mentioned that the deceased person had a knife at the time of the altercation, but Woods testified that he did not see any sort of weapon, like a firearm, knife, or other deadly weapon, near the victim's body nor in his hands. State's Exhibit 13, the recording from Woods's body camera, was published to the jury.

On cross-examination, Woods agreed there were other people at the scene when he arrived, and he would have no way of knowing whether those people might have removed weapons before the police arrived. Woods agreed that a person who was high on methamphetamine could potentially be violent.

Testimony of Officer Willie Melancon

Officer Willie Melancon testified that he was on patrol on April 26, 2020, and he was dispatched to a disturbance involving a shooting victim on Stone Town Road. In Melancon's opinion, the victim had only been deceased for a short time because the blood around his body was not dried and was still pooling underneath him.

Melancon testified that he did not see any kind of weapon, such as a firearm, knife, club, or wrench, near the victim.

According to Melancon, law enforcement had been told that the shooter had left the scene in a white pickup truck, and while the officers were present, the white pickup returned, and Officer Woods detained the driver. Upon approaching the white truck to back up Officer Woods, Melancon observed "an abundance of blood on the driver's side door on the outside[]" of the truck. Melancon identified the defendant as the driver of the white pickup truck. Melancon also testified that the defendant told officers at the scene, "I'm the one who shot him."

Melancon testified that taking the defendant into custody was complicated by the fact that the driver's side door of his pickup truck did not have a handle on the outside. Melancon testified that the defendant said his firearm was in the back of his truck, and Melancon found the firearm in the bed of the truck. According to Melancon, the firearm was a .308 caliber rifle, which is a "very high-powered caliber." In Melancon's opinion, if the driver was inside the truck with the window rolled up with someone attacking, the driver's first duty should be to drive away and not to shoot. Melancon agreed that he wore his body camera while he responded to the incident. The recording from the body camera was admitted into evidence as State's Exhibit 14 and published to the jury.

On cross-examination, Melancon agreed that in his body camera recording he says that the police "are always out there to that area[]" because of disputes between neighbors. He also agreed that his report of the incident noted that Kapel made several statements declaring that his actions were based on self-defense.

Testimony of Officer Jay Revia

Officer Jay Revia testified that he works for the Beaumont Police Department, and he was dispatched to a call about a shooting victim on Stone Town Road on April 26, 2020, where he assisted with retrieving potential evidence from a white pickup truck. Revia identified State's Exhibits 44 through 60 as photographs of items he retrieved from the scene of the shooting that day. According to Revia, the items included a black rifle with a "silver-ish" barrel, a rifle cartridge, and a magazine.

Testimony of Michelle Ceja

Michelle Ceja, a crime scene technician for the Beaumont Police Department, testified that she was called to a scene on Stone Town Road on April 26, 2020, related to a shooting victim. Ceja testified that, after she marked the scene, she took the photographs depicted in State's Exhibits 15 through 31. Ceja identified tire marks in Exhibits 29 through 31. Ceja also testified that she collected items located in the back of the suspect's vehicle, including a rifle and its contents. Ceja testified that she photographed the defendant and collected gunshot residue ("GSR") from him. Ceja identified possible blood on the defendant's fingers in State's Exhibit 62.

11

Ceja identified State's Exhibit 75 as the GSR evidence collection kit she used on Kapel. Ceja also testified that she took swabs or biological samples from various items that could later be used to test for DNA, including the rifle, items in Kapel's truck, the steering wheel, the driver's side rear panel arch paneling, the driver's side door and tire of Kapel's truck, and the broken front driver's side window of Kapel's truck. According to Ceja, after collecting these samples, she delivered them to a secure evidence locker in the property division of the police department.

On cross-examination, Ceja identified certain photographs of Kapel that were admitted into evidence. The photographs depicted bruising or an injury on Kapel's left arm, marks on his legs, and marks or bruising on his head.

Testimony of Steve Mayes

Steve Mayes, a forensic scientist with the Jefferson County Regional Crime Lab, testified that his lab does not do DNA testing, but it does test for blood or other body fluids. Mayes testified that he did the blood testing on various items of evidence, and blood was detected on the items admitted as State's Exhibits 81 and 82, which included swabs from the broken front driver window, the steering wheel, and the barrel of the rifle. After he completed his testing, he packaged the swabs and sent them to the Department of Public Safety ("DPS").

<u>Testimony of Timothy Spikes</u>

Timothy Spikes testified that he is an investigator with the Beaumont Police Department, and on April 26, 2020, he was dispatched to a location on Stone Town Road relating to a shooting. According to Spikes, when he arrived at the scene, the suspect was detained in a patrol vehicle, and the suspect wanted to speak with him. Spikes identified the defendant as the suspect. Spikes agreed that the defendant gave him a voluntary statement that day, during which Spikes asked no questions. According to Spikes, Kapel told him he was injured during the incident, and he wanted his injuries to be photographed. Spikes testified that he saw some possible discoloration, bruising, and injuries on Kapel's lower legs, and he agreed that a police ID technician took photographs of the injuries. Spikes reviewed photographs of Kapel in State's Exhibits 65 through 67, and he testified they showed no "apparent[]" injuries or possibly only minor injuries.

Spikes agreed that he later had a more formal interview of the defendant at the scene that was recorded and during which Kapel was given *Miranda* warnings. A recording of the interview was admitted as State's Exhibit 102. According to Spikes, Kapel told him that the victim slammed his leg in the door twice, but this did not make sense to Spikes because the injuries were to Kapel's right leg, which would indicate he was outside of his vehicle, and "[t]here w[ere] no injuries at all to indicate that he was getting slammed in the door." In addition, Spikes noted there was no

13

door handle to open the driver's door, even though Kapel had stated in his 911 call that the victim opened his door. Spikes explained as follows:

> I was [led] to believe that - - from the 911 recording that Mr. Kapel stated that "he opened my door, attacked me, and then I shot him." So in order to open that door, the victim had to reach inside the vehicle because there was no door handle to open the door. So the victim was actually close once that shot was fired. That indicated to me, if he opened the door, like Mr. Kapel stated, there would be injuries consistent with what he said; and those injuries weren't consistent.

In addition, Spikes testified that, in the three interactions he had with Kapel, Kapel did not say that the victim was wielding some sort of deadly weapon.

Spikes also testified that, while at the scene, he retrieved a knife out of Jack's vehicle after Jack consented to a search and after witnesses "stated that a possible knife was involved." According to Spikes, Jack's knife was not blood soaked, and the knife appeared to have been "stuck between the seat like it had been there for a while[]" and in Spikes's opinion, "the knife had been there a long time." Spikes testified that, if Jack's knife had been involved in the incident, there would have been blood on it.

Spikes obtained a blood spot card after the victim's autopsy. He also obtained a search warrant to get a DNA sample from Kapel, and Kapel voluntarily gave Spikes permission to get a buccal swab. Spikes testified that these samples were sent to the DPS crime lab.

14

On cross-examination, Spikes agreed that, in Kapel's recorded interview, he stated, "I didn't want this to happen." Spikes agreed that Kapel's injuries could have occurred if he had opened his truck's door and had both legs outside of the truck, but he testified that, in his opinion, Kapel's injuries were not consistent with being slammed by a vehicle door. Spikes also agreed that the search of Jack's vehicle identified a wrench on the seat that was photographed for evidence. Spikes identified Defendant's Exhibit 7 as a small baggie of a narcotic drug that was in the victim's front left pocket. Spikes agreed that it was possible that Kapel shot Shane Jones from inside Kapel's vehicle.

On redirect, Spikes agreed that in his twenty-one years of experience as a police officer, there had never been an instance where an automobile door was used as a deadly weapon. He also agreed that Kapel's injuries were not consistent with serious bodily injury.

Testimony of Jennifer Young

Jennifer Young testified that she is a forensic scientist in the DNA section of the DPS Safety Crime Laboratory in Houston. Young agreed that she prepared a forensic biology and DNA lab report in connection with this case. Young testified that the DNA from the swab of the broken front driver window in Kapel's truck was from a single individual, and the "probability of obtaining this profile if the DNA came from Shane Jones is 271 septillion times greater than the probability of

15

obtaining a profile if the DNA came from an unrelated, unknown individual." Young excluded Kapel as a contributor of this profile. As to the DNA from the swab of the steering wheel from Zachary Kapel's vehicle, Young testified that "[t]he probability of obtaining this profile if the DNA came from Zachary Kapel is 31.3 septillion times greater than the probability of obtaining the profile if the DNA came from an unrelated, unknown individual." Young excluded Shane Jones as a contributor of this profile. Young also testified that her analysis of the DNA swab from the barrel of the rifle reflected that both Kapel and Jones were possible contributors to the profile. Young interpreted the DNA from another swab from the rifle to be a mixture of three individuals, including Kapel and Jones as possible contributors.

Testimony of Dr. Selly Strauch

Dr. Selly Strauch testified that she is the chief forensic pathologist at Forensic Medical Management Services of Texas, and she performed an autopsy of Shane Jones. Dr. Strauch concluded that the manner of Shane Jones's death was homicide, and the cause of his death was "gunshot wound, right full wound in chest perforating lungs, trachea, and aorta." Strauch testified that Jones received an "intermediate range gunshot wound[]" to his left upper chest, which resulted in massive internal bleeding. According to Strauch, the stippling marks on Jones reflected that the fatal shot occurred "between two inches and two f[ee]t" away. Strauch testified that, based on the stippling, she concluded that Jones was "definitely facing whoever

16

[shot] him on the left side of his body." Strauch further testified that the entrance wound is on the left side of Jones's chest, and the exit wound is underneath his armpit. Strauch testified that the toxicology analysis of Jones showed "[m]ethamphetamine and [] the metabolized amphetamine[,]" but it was not the cause of his death. Photographs from the autopsy of Jones were admitted into evidence.

On cross-examination, Strauch testified that Jones's body had both stippling and pseudo stippling, and she agreed that the pattern was consistent with Jones being at a vehicle's door with his left arm behind a partially opened window. She also testified that the toxicology analysis showed Jones tested positive for caffeine, cotinine, amphetamine, and methamphetamine.

On redirect, Strauch agreed that the evidence in this case was not consistent with Jones having his arm inside the vehicle before he was shot. She also agreed that the pattern of stippling and pseudo stippling reflects that something—such as a window—was between the body and the bullet that was fired. In examining Defendant's Exhibit 22, a photograph of Kapel's lower legs taken on the day of the shooting, Strauch testified that the injuries she observed in the photo looked like an abrasion, whereas injuries from getting a car door slammed on one's leg would look more like "pattern blunt force trauma[]" with bruising.

17

Testimony of Captain Bruce Minter

Captain Bruce Minter testified that he is the records and technology captain at the Jefferson County Correctional Facility and the custodian of records for phone calls made by inmates. Minter testified that inmate phone calls are recorded, and he screens the phone calls. According to Minter, when an inmate begins to make a phone call, a recording tells the inmate his balance and states that the calls are recorded. Minter testified that, when an inmate makes a phone call, he identifies himself by his voice and also a pin number. Minter identified State's Exhibit 103 as recordings of two phone calls made by Zachary Kapel and Exhibit 103 was published to the jury. In one call, Kapel tells a woman and a man Kapel called that it was "self defense." When the man asks Kapel whether the person had a weapon, Kapel replies, "I'm not sure." Later in the conversation, Kapel tells the man, "I went to pick my girlfriend up, and the next thing you know my car got bum rushed."

In another call to a woman, the following exchange occurs:

Woman: Did he come at you while you were in your truck?

Kapel: Yeah, I didn't even see it until he was already up on the truck. I couldn't see his hands.

Woman: Well, how do you know he had a knife then?

Kapel: I don't know if he did or didn't. He was making threats. I mean, I know he has one. He always does. I know who he is.

18

Testimony of "Hope"

The defense called Hope as a witness, and Hope testified that, at the time of trial, she was serving time for possession of methamphetamine. She testified that she and Kapel had been "on and off boyfriend and girlfriend[,]" and she had been friends with Shane Jones. Hope agreed that, on the day of the shooting, she was at the property off Tram Road where Shane was living, and she saw Shane smoke methamphetamine that day. According to Hope, Shane smoked methamphetamine until minutes before she was ready to leave, and Shane would get excited and "hyper" when he smoked methamphetamine, and she knew Shane had "a violent history" and was a "hot head." At some point, she called Kapel to come get her. Hope testified that, when she got off the phone, Shane asked if she called Kapel, and when she said yes, Shane "got excited" and said he was going to hit him with the nine-inch orange pipe wrench he had in his hand and that he would "bust his windshield and get him." Hope agreed that Shane said Kapel owed him money for selling him "fake drugs." According to Hope, when Kapel arrived, Shane ran toward Kapel's truck with the pipe wrench raised above his head, she heard a crack and a click, and she thought that Shane had broken Kapel's windshield. Hope testified that she saw Shane hit the truck. She then heard a door slam and a gunshot. When she got to Kapel's truck, Kapel was getting out of the truck, and Shane was on the ground. According to Hope, Kapel said, "He came at me. He attacked me. [] I

19

thought he was going to stab me. [] We have to call 911." At that point, Hope went next door and asked people to call 911. Hope testified that Shane was lying face down about two feet from Kapel's truck.

On cross-examination, Hope agreed that, on the day before the shooting, she asked Kapel to sell her a "ball" of methamphetamine so she could sell it to Shane, but she did not tell Kapel she planned to sell it to Shane because there was already tension between the two men. Hope agreed that she told the police that Shane was running towards Kapel's truck "with something in his hand," but she never mentioned an orange pipe wrench. Hope also agreed she did not witness the shooting itself.

Testimony of Zachary Kapel

Zachary Kapel testified that, on the day of the incident, he was at home when he received a phone call from Hope asking him to pick her up at Fred's house. Kapel testified that Shane also lived at Fred's property, about three miles from Kapel's home. Kapel testified that he drove his truck to Fred's house, and his rifle was in the extended cab behind the driver's seat. According to Kapel, he had just gotten the rifle and was getting ready to use it for deer hunting. Kapel recalled that, when he got to Fred's property, he pulled into the driveway, but "not all the way[,]" because he and Shane had fought a couple of days earlier and he did not want any problems. Kapel explained that, when he stopped, he "did a 360 view [to] make sure nobody

20

was around." Kapel further testified that he opened his door just enough to make room for his legs, his feet were hanging down and not touching the ground, and the door was "leaning on [his] legs." As he was waiting for Hope and looking at his phone, he heard "something loud, bang, something hit [his] truck. [] Like, someone hit it with something solid, like, a piece of metal." Kapel thought the loud noise came from the front right of the truck, possibly the passenger side. Kapel agreed the noise sounded like metal on metal, "almost a gunshot[,]" and Kapel could feel the impact. According to Kapel, when he looked up, he saw someone moving fast who slammed into the door of his truck and pushed on the door. Kapel agreed that, when the person slammed into his door, it hit his lower legs and his legs were pinned. Kapel testified that "it wasn't a terrible pain, but it really hurt." Kapel recalled that, when he looked up, he saw it was Shane Jones who had slammed against the truck, Shane was screaming that Kapel should have known better than to come to the property, and Shane said "I'm about to f*** your a** up."

Kapel testified that, at that point, Shane "immediately grabbed [his] window[.]" According to Kapel, his window was rolled down "maybe a third[.]" Kapel testified that he could not see anything in Shane's hand, but he knew Shane had something in his right hand because he had just hit the truck with it. Kapel agreed that Shane stuck his arm through the door window, possibly to roll the window down, and Kapel reached for his firearm. Kapel screamed at Shane to back up, but

21

Shane did not seem to care even though Shane had seen the gun, and Kapel thought Shane appeared "out of control[,]" the same way Shane looked a couple of days earlier when Shane assaulted Kapel. According to Kapel, Shane reached for the truck window with his left hand to either break the window or throw something at Kapel's face, and Shane's right hand was still. Kapel testified that Shane was screaming at him, and Kapel had no doubt that Shane "was coming in." Kapel recalled that he told Shane to stop and to back up, but that Shane would not stop. Kapel testified, "I felt like he was about to either keep me or severe - - put me in the hospital[.]" After Shane cocked his arm, it appeared he was about to smash the window, and Kapel pulled the trigger and fired once. According to Kapel, he was trying to stop Shane, not kill him. Kapel recalled that Shane fell to the ground "very close[]" to the truck. When Kapel's attorney asked if he saw a weapon in Shane's hand, Kapel replied, "I didn't look."

According to Kapel, at that point, Hope, Anna, and Jack ran towards him and they were all screaming. Kapel testified that he told Hope to get in the truck, but she did not, and Kapel drove away. Kapel recalled that a few minutes later, he called 911, who instructed Kapel to return to the property. Before he returned, he took the clip out of his rifle and put it in the back of his truck.

Kapel testified that, in the year he had known Shane, the police were called to the house a few times for Shane "beating up his girlfriend." Kapel agreed that Shane

22

used methamphetamine. According to Kapel, he had bought a welder a couple of days before the shooting, and Shane stole it, and when Hope asked for an "eight ball" of methamphetamine for Shane, Kapel gave her a bag of Epsom salt, which Hope then sold to Shane. Kapel recalled that Shane called him making threats and also showed up at Kapel's house. Kapel testified that, another time, Kapel was helping people move a mattress to the property where Shane lived, and Shane attacked Kapel, told Kapel he should not have come over, and slammed Kapel's truck door, and the two men ended up fighting. Kapel did not know why Shane was "out of control." According to Kapel, he told the police that he did not want this to happen, he did not want Shane to be killed, and he just did not want anything to do with Shane.

On cross-examination, Kapel testified that the driver's side door handle on his truck was not connected and was not usable, but there is a nearby lever that connects to the handle, which someone can use to open the door from inside or outside the truck. Kapel agreed he knew before the shooting that Shane lived at Fred's property, and Shane had told Kapel not to come over there. Kapel testified that he never said, "I told you this was going to happen." Kapel also testified that he did not mean to kill Shane, but he agreed he was attempting to injure Shane, and he gave Shane warnings. According to Kapel, the photo in Defendant's Exhibit 22 depicts the injuries he received from the vehicle door being slammed on his legs. Kapel testified

23

that he could not see what Shane was holding, but there was "no doubt in [Kapel's] mind that [Shane] had a weapon[,]" Shane hit Kapel's truck with "something hard[,]" and when Shane was coming into Kapel's truck, Kapel "felt like [he] had no choice but to defend [him]self[]" and Kapel "felt like [he] was about to be killed [] or seriously injured." According to Kapel, when Shane put his arm through the truck window or smashed the window, it was "a beginning of a life threatening event." When shown photographs of his truck from the day of the shooting, Kapel could not identify any damage to the truck caused by Shane. Kapel agreed that Shane died as a result of Kapel shooting him.

The jury charge included an instruction on self-defense.[2] The jury found Kapel guilty of murder as charged in the indictment. After a hearing on punishment, the jury assessed punishment at sixty-five years of imprisonment and a fine of $10,000. Kapel timely filed a notice of appeal.

## Standard of Review and Applicable Law

In reviewing the legal sufficiency of the evidence—including the evidence supporting a jury's rejection of a self-defense claim—we review all the evidence in the light most favorable to the verdict to determine whether any rational factfinder could have found the essential elements of the offense beyond a reasonable doubt. *Jackson v. Virginia*, 443 U.S. 307, 319 (1979); *Braughton v. State*, 569 S.W.3d 592,

_____

[2] Kapel does not challenge the jury charge on appeal.

24

607-08 (Tex. Crim. App. 2018); *Hooper v. State*, 214 S.W.3d 9, 13 (Tex. Crim. App. 2007). We give deference to the factfinder's responsibility to fairly resolve conflicts in the testimony, to weigh the evidence, and to draw reasonable inferences from basic facts to ultimate facts. *Hooper*, 214 S.W.3d at 13. If the record contains conflicting inferences, we must presume that the factfinder resolved such facts in favor of the verdict and defer to that resolution. *Brooks v. State*, 323 S.W.3d 893, 899 n.13 (Tex. Crim. App. 2010) (citing *Jackson*, 443 U.S. at 326); *Clayton v. State*, 235 S.W.3d 772, 778 (Tex. Crim. App. 2007); *see also Jackson*, 443 U.S. at 319 (the factfinder's responsibility is "to resolve conflicts in the testimony, to weigh the evidence, and to draw reasonable inferences from basic facts to ultimate facts[]"); *Murray v. State*, 457 S.W.3d 446, 448-49 (Tex. Crim. App. 2015) (citing *Hooper*, 214 S.W.3d at 12). The jury as factfinder is the sole judge of the weight of the evidence and credibility of the witnesses, and it may believe all, some, or none of the testimony presented by the parties. *See Febus v. State*, 542 S.W.3d 568, 572 (Tex. Crim. App. 2018); *Margraves v. State*, 34 S.W.3d 912, 919 (Tex. Crim. App. 2000); *Heiselbetz v. State*, 906 S.W.2d 500, 504 (Tex. Crim. App. 1995). The appellate court does not reweigh the evidence nor determine the credibility of the evidence, nor does it substitute its own judgment for that of the factfinder. *Williams v. State*, 235 S.W.3d 742, 750 (Tex. Crim. App. 2007).

"Direct and circumstantial evidence are treated equally: 'Circumstantial evidence is as probative as direct evidence in establishing the guilt of an actor, and circumstantial evidence alone can be sufficient to establish guilt.'" *Clayton*, 235 S.W.3d at 778 (quoting *Hooper*, 214 S.W.3d at 13). Each fact need not point directly and independently to the guilt of the defendant, as long as the cumulative force of all the incriminating circumstances is sufficient to support the conviction. *Temple v. State*, 390 S.W.3d 341, 359 (Tex. Crim. App. 2013); *Hooper*, 214 S.W.3d at 13; *Johnson v. State*, 871 S.W.2d 183, 186 (Tex. Crim. App. 1993).

In a homicide case, the defendant's state of mind is a question of fact for the jury to determine, and the jury may infer intent "from any facts in evidence which it determines proves the existence of such intent to kill, such as the use of a deadly weapon." *Brown v. State*, 122 S.W.3d 794, 800 (Tex. Crim. App. 2003) (citing *Hall v. State*, 418 S.W.2d 810, 812 (Tex. Crim. App. 1967)). "It is both a common-sense inference and an appellate presumption that a person intends the natural consequences of his acts and that the act of pointing a loaded gun at someone and shooting it toward that person at close range demonstrates an intent to kill." *Ex parte Thompson*, 179 S.W.3d 549, 556 n.18 (Tex. Crim. App. 2005) (internal citations omitted). Intent to murder can be inferred from circumstantial evidence, such as a defendant's acts, words, and the extent of the victim's injuries. *See Ex parte Weinstein*, 421 S.W.3d 656, 668-69 (Tex. Crim. App. 2014). Evidence of flight

reflects on a defendant's consciousness of guilt of the crime charged. *See Yost v. State*, 222 S.W.3d 865, 875 (Tex. App.—Houston [14th Dist.] 2007, pet. ref'd) (citing *Bigby v. State*, 892 S.W.2d 864, 884 (Tex. Crim. App. 1994) (en banc)).

A person is justified in using force against another when and to the degree that person reasonably believes the force is immediately necessary to protect himself against another person's use or attempted use of unlawful force. *See* Tex. Penal Code Ann. § 9.31(a); *Gamino v. State*, 537 S.W.3d 507, 510 (Tex. Crim. App. 2017). A person is justified in using deadly force if he would be justified in using force under section 9.31, and he reasonably believed that deadly force was immediately necessary to protect himself against another's use or attempted use of deadly force. *Gamino*, 537 S.W.3d at 510; *see also* Tex. Penal Code Ann. § 9.32(a). The Penal Code defines the term "reasonable belief" to mean a "belief that would be held by an ordinary and prudent man in the same circumstances as the actor." Tex. Penal Code Ann. § 1.07(42).

Whether the defendant acted in self-defense is a question for the jury to decide. *Saxton v. State*, 804 S.W.2d 910, 913 (Tex. Crim. App. 1991). Where a defendant claims self-defense, the defendant bears the burden of production, which requires the production of some evidence that supports the defense. *See Zuliani v. State*, 97 S.W.3d 589, 594 (Tex. Crim. App. 2003) (citing Tex. Penal Code Ann. § 2.03; *Saxton*, 804 S.W.2d at 914). Once the defendant produces such evidence, the

27

State then bears the burden of persuasion to disprove the defense. *Id.* The State is not required to produce evidence that refutes the claim of self-defense, but it must prove its case beyond a reasonable doubt. *Id.* A jury is free to accept or reject the evidence of self-defense, and a jury verdict of guilty is an implicit finding against the defensive theory. *See id.*; *Saxton*, 804 S.W.2d at 914.

Analysis

Appellant testified that he shot Shane Jones, and the only issue on appeal is the sufficiency of the evidence to support the jury's implicit finding rejecting Kapel's claim that he acted in self-defense. Appellant argues that he shot Jones in self-defense after Jones ran up to Appellant's vehicle and struck it with something hard, possibly a pipe wrench. Appellant claims he feared for his safety and for his life, and he fired a hunting rifle at Jones from inside the vehicle, and he killed Jones.

The jury heard Anna testify that, when she saw Shane before the shooting, she did not see him carrying a firearm, knife, club, bat, pipe wrench, nor any other weapon. Anna also testified that, after the shooting, she did not see a weapon, knife, wrench, nor pipe near or around Shane's body. Paul, a neighbor, testified that when he went to the property immediately after the shooting, he did not see a weapon, gun, or knife near Shane's body. Officers Woods and Melancon, who responded to a call of the shooting on April 26, 2020, testified that they did not see any kind of weapon, including a firearm or knife, near Shane's body or hands. Investigator Spikes

28

testified that, while investigating at the scene shortly after the shooting, he found a knife in Jack's vehicle, but Spikes thought the knife had been stuck in the seat of the car for quite some time. Spikes also agreed that the search of Jack's vehicle identified a wrench on the seat that was photographed for evidence. Dr. Strauch testified that the evidence in this case was not consistent with Jones having his arm inside the vehicle before he was shot. She also agreed that the pattern of stippling and pseudo stippling reflects that something—such as a window—was between the body and the bullet that was fired. In examining Defendant's Exhibit 22, a photograph of Kapel's lower legs taken on the day of the shooting, Strauch testified that the injuries she observed in the photo looked like an abrasion, whereas injuries from getting a car door slammed on one's leg would look more like "pattern blunt force trauma[]" with bruising.

By contrast, Hope testified for the defense that Shane had run towards Kapel's truck just before the shooting carrying a nine-inch orange pipe wrench. Kapel testified at trial that he knew Shane had "something" in his right hand and that Shane hit his truck with something solid that sounded like metal. Kapel admitted at trial that the photographs of his truck that were taken after the shooting did not show any damage to his truck caused by Shane. When Kapel's attorney asked if Kapel saw something in Shane's hand, Kapel answered, "I didn't look." In recorded telephone

29

calls in jail, Kapel told people whom he called that he was not sure whether Shane had a weapon and that he could not see Shane's hands.

Kapel stated in his 911 call that someone had slammed the vehicle door on his legs, and he testified at trial that Shane slammed into his vehicle and his legs were pinned by the door of his truck. Dr. Strauch testified that the photographs of Kapel's legs on the day of the shooting looked like he had an abrasion but not the kind of blunt force trauma and bruising he would have had if a car door had been slammed on his legs. Investigator Spikes testified that photographs of Kapel's legs showed only minor injuries and that Kapel's injuries were not consistent with being slammed by a vehicle door nor with serious bodily injury.

Kapel testified that he left the property immediately after the shooting, but he returned after he called 911. Flight is circumstantial evidence from which a jury may infer consciousness of guilt. *See Devoe v. State*, 354 S.W.3d 457, 470 (Tex. Crim. App. 2011) (citing *Alba v. State*, 905 S.W.2d 581, 586 (Tex. Crim. App. 1995)); *Bigby*, 892 S.W.2d at 884.

In this case, the jury was presented with conflicting views about the shooting, and it had to decide the case based on which view it determined was more credible. *See Braughton*, 569 S.W.3d at 610. There is sufficient evidence in the record to rationally support the jury's rejection of Appellant's version of events. *Id.* at 611. The jury's decision to reject Kapel's claim of self-defense could have hinged on the

30

credibility of the witnesses and the weight the jury decided to give to their testimony. *See Smith v. State*, 355 S.W.3d 138, 146 (Tex. App.—Houston [1st Dist.] 2011, pet. ref'd) (citing *Chambers v. State*, 805 S.W.2d 459, 461 (Tex. Crim. App. 1991)). The testimony of a defendant does not conclusively prove a self-defense claim. *Id.* Here, the jury chose not to believe Kapel's and Hope's testimony and to believe the testimony of the other witnesses. The State's witnesses, the physical evidence, and Kapel's flight from the scene undermine Kapel's claim of self-defense. We conclude that, based on the evidence presented at the trial, the jury could have rationally rejected Kapel's claim of self-defense and determined that deadly force was not immediately necessary at the time Kapel shot Jones. *See* Tex. Penal Code Ann. §§ 9.31, 9.32; *Braughton*, 569 S.W.3d at 610-11. We conclude that the evidence is sufficient to support the jury's rejection of Appellant's self-defense claim, and we overrule his issue. *See Braughton*, 569 S.W.3d at 613.

Having overruled Appellant's issue, we affirm the trial court's judgment of conviction.

AFFIRMED.

LEANNE JOHNSON
Justice

Submitted on May 3, 2024
Opinion Delivered June 12, 2024
Do Not Publish

Before Golemon, C.J., Horton and Johnson, JJ.

31