

# In the
# Court of Appeals
# Sixth Appellate District of Texas at Texarkana

No. 06-24-00168-CR

JAMES EARNEST ARCHER, JR., Appellant

V.

THE STATE OF TEXAS, Appellee

On Appeal from the County Court at Law No. 2
Hunt County, Texas
Trial Court No. CR2400305

Before Stevens, C.J., van Cleef and Rambin, JJ.
Memorandum Opinion by Justice Rambin

## MEMORANDUM OPINION

James Earnest Archer, Jr., appeals his conviction for the misdemeanor offense of unlawful restraint. *See* TEX. PENAL CODE ANN. § 20.02(c) (Supp.). Archer claims there is insufficient evidence to support his conviction because his low blood sugar at the time of the offense prevented him from possessing the requisite mental state to satisfy the elements of the offense.[1] Finding the evidence sufficient to support the trial court's judgment, we affirm.

## I.      Background

Archer and Darla Baker lived together, and though they had previously been in a dating relationship, at the time of the offense, they had been living only as roommates for at least a year. Baker testified that on the morning of the offense, she awoke at 5:00 a.m. to find Archer sitting beside her on her bed, with all her bedroom and bathroom lights on. Baker said that was unusual because Archer did not usually enter her bedroom for any reason. Baker asked Archer why he was in her room, and he initially did not respond, but as he was leaving her room about ten minutes later, he said, "I wanted to talk to you," in a very mean tone. Baker then got up and walked toward the living room, where she asked Archer, who was sitting on the couch, why he was in her room and why he woke her up, and he did not answer.

Baker said she could not find her phone that morning because Archer had it.

---

[1]Archer also appeals his conviction of family violence assault causing bodily injury in our cause number 06-24-00169-CR. Although Archer filed a single, consolidated brief addressing his conviction on both charges, we address only Archer's appeal of his conviction for unlawful restraint in this opinion. We address Archer's appeal of his conviction for family violence assault causing bodily injury in a separate opinion in cause number 06-24-00169-CR, issued this same day.

Baker then laid back down in her bedroom for a while, because she planned to log onto her remote job at 9:00 a.m. Baker later went back into the living room and sat down in her recliner. Again, she asked Archer what he wanted to talk about. Archer did not answer, but he got up, stood in front of her, told her that he hated her, and punched her in the head three times with a closed fist. Baker testified that she "was scared to death."

Baker said Archer had a rope in his hand when he hit her, and he said, "[W]e can do this the hard way or the easy way." Archer had Baker stand up and put her hands behind her back, and he restrained her by tying her hands together with the rope. Archer directed Baker back to her bedroom, and she laid down on her bed with her back to him, begging him not to hurt her. Archer was not talking to her. Baker stated she could not loosen the rope, and she laid on the bed for at least an hour. Archer indicated he "wanted to have physical relations," and he pulled her pants down, but he was unable to perform.

At some point, Baker told Archer she needed to use her computer to log back into her job. They both stood up and went back to the living room, where Archer sat next to Baker as she logged in on her computer. Eventually, Archer got up to go to the bathroom, and Baker communicated to her boss that she had been assaulted and asked her to call 9-1-1.

The police arrived ten to fifteen minutes later. Baker said she did not feel comfortable walking past Archer to get to the door so she suggested that he go outside first, and she would follow. Archer did not go outside, and he had a knife. Baker got under her desk because she was afraid. Baker yelled for help, and the police came in and handcuffed Archer.

3

On cross-examination, Baker testified she was aware Archer had diabetes. She had seen the effects of an insulin crash before. Sometimes she would find Archer unconscious and unresponsive on the floor, and sometimes he had to go to the hospital. Baker was aware that low blood sugar could affect Archer's behavior, and she could usually tell by Archer's behavior whether his blood sugar was low. Baker said sometimes Archer became lethargic or confused when he had low blood sugar, but she never saw it cause him to be aggressive.

Baker said if she realized Archer was having a low blood sugar attack, she would fix him something to eat or drink to bring his blood sugar back up. Baker admitted sometimes Archer had to be "pretty bad off" before she realized his blood sugar was low. Baker testified that sometimes when Archer had a low blood sugar event, he was not sure what was going on around him. She said that had happened numerous times, and she "had to call 911 probably three dozen times." Baker said Archer was not acting like he was having a low blood sugar event on the day of the offense, but he was acting deliberately and knew what he was doing during the entire five-and-a-half-hour period between when he woke her and when the police arrived.

Deputy William Foutz from the Hunt County Sheriff's Office (HCSO) testified he was a responding officer on the day of the incident. Foutz said that Archer admitted to tying Baker up and hitting her in the head.

Deputy Russell Prather from the HCSO, another responding officer, testified as well. Prather said Archer answered the door and said he would get Baker. Prather then heard Baker inside the house saying, "James, stop," and "help." Prather entered the house and found Archer standing, with Baker on the floor and a knife next to him and another knife on the counter.

4

Prather said Archer told him "they were just arguing all morning." Archer told Prather he had tied Baker up, and he also mentioned his diabetes and a low blood sugar event that morning. Prather said Archer was asked "if he knew the severity of [the situation]," and Archer responded that he did, and Archer said "he was probably going to kill her." Prather testified that the medics on hand said they had a history with Archer's blood sugar events. Prather said the medics did not give Archer insulin, but the deputies allowed Archer to give himself his insulin before they transported him to jail.

Joe Sterner, Chief of Police for the City of Lone Oak, was also a responding officer. Sterner testified he was familiar with Archer because he had been to the home several times due to problems with Archer's diabetes. Sterner said he had seen Archer unconscious and "a little out of it" when his blood sugar was not regulated, but he had never seen Archer cause a disturbance or act aggressively.

Archer testified that he woke up on the morning of the incident knowing his blood sugar was low, and like he usually did in that situation, he went to Baker's bedroom to tell her. Archer said he "turned on all the lights" so Baker would know he "wouldn't do anything else," and he sat on her bed to wake her up. Archer said he couldn't talk, but he started rocking back and forth because that is what he usually does when his blood sugar is low. He said he sat there about fifteen or twenty minutes, then Baker started yelling and she got up and turned the lights off. Archer said Baker followed him to the living room several minutes later and started yelling at him, asking what he wanted to talk about. Archer said he told Baker to stop yelling at him and after that, he "just went blank" and did not remember anything else.

5

Archer said he remembered that when he and Baker were in Baker's bedroom, and she told him to untie her, she was on top of him in a sexual manner. He said he did not remember pulling her pants down, but he remembered Baker pulling them off herself. Archer said it was unusual for Baker and him to act in a sexual manner toward each other.

Archer said when his blood sugar was low, he got dry mouth, weakness, confusion, and he could not check his own blood sugar because his vision and control of his hands was too bad. Archer said he controlled his blood sugar by taking insulin twice a day and by eating something if his blood sugar got too low. Archer said he had "a tendency to become aggressive if [his] blood sugar [was] low," "especially if [he was] being yelled at." The morning of the incident, Archer said he drank a Gatorade and two Cokes because Baker said he had "done all this stuff" and he did not remember it. Archer said by the time the officers arrived, it had been about an hour or an hour and a half since he had the Gatorade and Cokes, and he "was in a good state" by then.

Archer testified he did not remember knowingly or recklessly hitting Baker in the head. Archer said he did not "remember restraining [Baker] at all." He continued, "[B]ut I'm not saying I didn't." He said he did not recall laying a hand on her and he "just remember[ed] when [he] c[a]me to, she was saying, untie me," and she had a rope around one wrist. Archer did not deny tying Baker up, he just said, "I don't remember it."

Archer testified he was on parole at the time of the incident, but he was not concerned about whether it would affect his parole.

The jury found Archer guilty and sentenced him to 180 days in jail. Archer appeals.

## II.     Standard of Review and Applicable Law

"We assess legal sufficiency by viewing the evidence in the light most favorable to the verdict and asking whether any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Bittick v. State*, 707 S.W.3d 366, 368 (Tex. Crim. App. 2024) (citing *Jackson v. Virginia*, 443 U.S. 307, 319 (1979)). "We compare the trial evidence to 'the elements of the offense as defined by a hypothetically correct jury charge for the case.'" *Id.* at 369 (quoting *Zuniga v. State*, 551 S.W.3d 729, 733 (Tex. Crim. App. 2018)).

"The jury is the sole judge of credibility and weight to be attached to the testimony of witnesses, and juries may draw multiple reasonable inferences from the facts so long as each is supported by the evidence presented at trial." *Tate v. State*, 500 S.W.3d 410, 413 (Tex. Crim. App. 2016) (citing *Jackson*, 443 U.S. at 319). "[W]e must keep in mind that a juror may choose to believe or disbelieve all, some, or none of the evidence presented." *Edward v. State*, 635 S.W.3d 649, 655 (Tex. Crim. App. 2021).

"On review, [the appellate] [c]ourt determines whether the necessary inferences made by the trier of fact are reasonable, based upon the cumulative force of all the evidence." *Braughton v. State*, 569 S.W.3d 592, 608 (Tex. Crim. App. 2018) (quoting *Adames v. State*, 353 S.W.3d 854, 860 (Tex. Crim. App. 2011)). "We presume that the factfinder resolved any conflicting inferences in favor of the verdict, and we defer to that resolution." *Id.*

"In reviewing the sufficiency of the evidence, we should look at "'events occurring before, during and after the commission of the offense and may rely on actions of the defendant which show an understanding and common design to do the prohibited act.'"" *Hammack v.*

7

*State*, 622 S.W.3d 910, 914 (Tex. Crim. App. 2021) (quoting *Hooper v. State*, 214 S.W.3d 9, 13 (Tex. Crim. App. 2007); *Williamson v. State*, 589 S.W.3d 292, 297 (Tex. App.—Texarkana 2019, pet. ref'd) (quoting *Hooper*, 214 S.W.3d at 13). "Each fact need not point directly and independently to the guilt of a defendant, as long as the cumulative force of all the incriminating circumstances is sufficient to support the conviction." *Walker v. State*, 594 S.W.3d 330, 335 (Tex. Crim. App. 2020) (citing *Hooper*, 214 S.W.3d at 13). "Direct evidence and circumstantial evidence are equally probative, and circumstantial evidence alone may be sufficient to uphold a conviction so long as the cumulative force of all the incriminating circumstances is sufficient to support the conviction." *Ramsey v. State*, 473 S.W.3d 805, 809 (Tex. Crim. App. 2015).

"A person commits [the] offense [of unlawful restraint] if he intentionally or knowingly restrains another person." TEX. PENAL CODE ANN. § 20.02(a) (Supp.).

### III. The Evidence of Archer's Mental State Was Sufficient to Support a Conviction of Unlawful Restraint

Archer claims the evidence is legally insufficient to support his conviction for unlawful restraint. He claims the State did not prove beyond a reasonable doubt that he acted with the requisite mental state when he committed the alleged offense, because his testimony established that he did not intend to restrain Baker. Essentially, Archer claims he was unaware of his actions due to his low blood sugar and therefore could not have acted with the requisite intent.[2]

---

[2]Archer has not raised error related to the conduct elements of unlawful restraint. Nonetheless, because unlawful restraint is a result-of-conduct offense, *see* 6 MICHAEL B. CHARLTON, TEXAS PRACTICE SERIES: TEXAS CRIMINAL LAW § 11.2 (2d ed. 2024), (stating that "[t]he gravamen of [unlawful restraint] is restraint of the complainant without his or her consent'); *cf. Ashley v. State*, 527 S.W.2d 302, 306 (Tex. Crim. App. 1975) ("The salient fact in a case of false imprisonment is the fact of restraint."), we perform our sufficiency analysis based on a hypothetically correct jury charge containing the result-of-conduct definitions of *intentionally* and *knowingly*. *See Bittick*, 707 S.W.3d at 368–69.

"A person acts intentionally, or with intent, with respect to . . . a result of his conduct when it is his conscious objective or desire to engage in the conduct or cause the result." TEX. PENAL CODE ANN. § 6.03(a). "A person acts knowingly, or with knowledge, with respect to a result of his conduct when he is aware that his conduct is reasonably certain to cause the result." TEX. PENAL CODE ANN. § 6.03(b).

"By its nature, a culpable mental state must generally be inferred from the circumstances." *Romano v. State*, 610 S.W.3d 30, 35 (Tex. Crim. App. 2020). "We cannot read an accused's mind, and absent a confession, we must infer his mental state from his acts, words[,] and conduct." *Id.*

Viewing the evidence in the light most favorable to the verdict, we determine a rational jury could have found, beyond a reasonable doubt, that Archer intentionally or knowingly substantially interfered with Baker's liberty by confining her with a rope, without her consent. Archer said to Baker, "[W]e can do this the hard way or the easy way," then he tied her hands together with a rope, led her to her bedroom, and acted like he wanted to have sex. After Baker was able to release herself from the rope and return to the living room, Archer sat next to her as she tried to work. When the police arrived, Baker was not comfortable walking past Archer to go to the door. Baker was afraid of Archer, and at that point, he had a knife.

By Archer's own testimony, his "blinked off" period ended during the time that he and Baker were in Baker's bedroom and some sort of sexual activity was attempted. Yet, later, when the police arrived and asked for Baker at the door, Archer wielded a knife while Baker was under

9

the table next to him, afraid to cross Archer's path to go to the door. Archer's own testimony excludes that time period from his claim on appeal.

Further, there was testimony that contradicted Archer's claim that he did not know what he was doing. Baker testified Archer was not acting like he had low blood sugar on the day he restrained her—rather, he acted deliberately and like he knew what he was doing. Although Archer testified that he did not remember restraining Baker, he also testified that he did not deny doing it. Further, even though Archer testified he could not use a blood sugar monitor to check his blood sugar due to lack of control of his hands, he was able to knot the rope around Baker's wrists sufficiently to keep her restrained for about an hour.

The jury heard and rejected Archer's claim that he did not intentionally or knowingly restrain Baker due to his low blood sugar. The jury was free to reject Archer's self-serving testimony that he did not remember restraining Baker and to accept instead Baker's testimony that Archer acted deliberately in restraining her. The evidence was sufficient for a reasonable jury to conclude that Archer acted intentionally or knowingly with respect to the result of his conduct when restraining Baker.

We overrule Archer's issue regarding his conviction for unlawful restraint.

## IV.    Conclusion

We affirm the trial court's judgment.

Jeff Rambin
Justice

Date Submitted:    April 2, 2025
Date Decided:      April 25, 2025

Do Not Publish

11